A00A1933. IN THE INTEREST OF B. N. A., a child.
(546 SE2d 819)

RUFFIN, Judge.

The biological father of B. N. A. appeals the juvenile court's order terminating his parental rights. The father asserts that there is insufficient evidence supporting the court's order and that there is no evidence establishing he was properly served with a notice to legiti-

---

[4] *Adams,* supra.

mate the child. For reasons that follow, we reverse.

1. Due process under the Fourteenth Amendment requires that "before a state may sever the rights of a parent in his natural child, the state must support its allegations of the parent's unfitness 'by at least clear and convincing evidence.' "[1] This right of due process extends to an unwed father "who demonstrates a commitment to parenthood by participating in the life of his child."[2] Though, on appeal from a juvenile court's order terminating parental rights, we review the evidence in the light most favorable to the state, we still must determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should have been terminated.[3] We do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met.[4]

Viewed in the light most favorable to the state, the evidence shows that, approximately one year before B. N. A. was born, the mother and father began living together. At the time, the father was on five years probation for a 1994 conviction of violating the Georgia Controlled Substances Act.

B. N. A., who was born prematurely on August 27, 1998, suffered from infantile asthma and chronic ear infections. Due to B. N. A.'s respiratory problems, the mother and father were advised to put her on an apnea monitor. The parents, however, failed to heed this advice. After learning of the situation, the Department of Family & Children Services (DFACS) became involved and developed a protective case plan for both parents. The plan required the parents to address B. N. A.'s medical needs, to cooperate with DFACS, and to improve their parenting skills with the help of a parenting aide. The mother and father complied with the case plan, and DFACS closed the file.

In June or July 1999, the father and mother separated. The father attributed the separation to the mother's drug problem. He explained that because the mother would leave and "stay gone a while," he figured she was abusing drugs. The father's suspicions were well founded. In July 1999, police found cocaine on a mirror in a hotel room were the mother and B. N. A. were staying. The mother was incarcerated after her arrest and subsequently pled guilty to violating the Georgia Controlled Substances Act.

---

[1] *Thorne v. Padgett*, 259 Ga. 650, 651 (386 SE2d 155) (1989) (quoting *Santosky v. Kramer*, 455 U. S. 745 (102 SC 1388, 71 LE2d 599) (1982)).

[2] Id.

[3] See *In the Interest of L. S.*, 244 Ga. App. 626-627 (536 SE2d 533) (2000).

[4] See id.

Following the mother's arrest, DFACS took temporary custody of B. N. A. A caseworker testified that, at that time, the father went to DFACS and asked "what he could do to visit with the child." The DFACS caseworker informed the father that "he would need to legitimate the child and then work on a case plan."

On August 3, 1999, the juvenile court conducted a deprivation hearing and found that B. N. A. was deprived. The court awarded temporary custody of B. N. A. to DFACS and, in a written order entered September 8, 1999, ordered the department to establish a reunification plan for the father. The court also required DFACS to establish a visitation schedule for the father. Although DFACS implemented a plan for the mother, it failed to establish either a reunification plan or a visitation schedule for the father. According to a DFACS caseworker, the department did not comply with the order because of its policy to not provide a putative father with a case plan until he legitimates the child.

On December 22, 1999, approximately four months after DFACS took temporary custody of B. N. A., the agency petitioned the juvenile court to terminate the mother's and father's parental rights. On March 7, 2000, the juvenile court conducted an evidentiary hearing on the petition. The mother and father were represented by counsel, and the child was represented by a guardian ad litem.

The transcript of the termination hearing shows that from June 1999, when the mother and father separated, until the March 7, 2000 termination hearing, the father provided only limited financial support for B. N. A. Specifically, the evidence showed that, although the father was gainfully employed, he gave the mother only approximately $100 for B. N. A.'s support. A caseworker testified that the father was never instructed to pay child support, and when asked why he never provided any further support for the child, the father responded that he "wasn't sure [he] was supposed to." Similarly, the father explained that he had failed to legitimate B. N. A. up to that time because he "thought [he] was going to be told when to start doing things that [he] was supposed to do, like parenting classes, stuff like that."

As for the father's personal contact with the child, the evidence showed that he accompanied the mother on five visits with B. N. A. and that he appeared for two visits when B. N. A. was not there. According to a caseworker, although the father would make attempts to interact with [B. N. A.] and she would . . . respond to that," he usually just sat and watched the child play by herself. As a consequence, B. N. A. appeared unenthusiastic about seeing the father, and there was no apparent bonding between the father and the child. Again, however, DFACS never established a visitation schedule for the father as ordered by the court, and the father never contacted

DFACS to request his own visits with the child.

The evidence also showed that the father lacked stable housing. During the eleven months preceding the hearing, the father lived in four different residences, and before that he "moved in and out with [his] mom." At the time of the hearing, the father was again living with his mother and had criminal charges pending against him related to drug distribution and shoplifting.

A DFACS caseworker testified that B. N. A. is currently living with a foster family who has voiced their intent to adopt her if she is placed for adoption. According to the DFACS caseworker, B. N. A. has bonded with the family. When asked why she acted so quickly to terminate the mother's and father's parental rights, the caseworker responded: "My job as a caseworker is to find permanency for this child." Finally, the child's guardian ad litem testified that it was a close call, but recommended that the court terminate the father's parental rights.

Based on this evidence, the juvenile court terminated both parents' rights in B. N. A. As for the father, the court found that he caused B. N. A. to be deprived and that the deprivation was likely to continue because he failed to legitimate the child, failed to support the child, and failed to visit and bond with the child. In its order, the court attributed DFACS's failure to establish a reunification plan to the father's failure "to legitimate [B. N. A.] in a timely manner." Although the court stated that it had informed the father that DFACS's "policy was that it would not offer him a [reunification plan] until he legitimated the child," the court inexplicably failed to mention that it had expressly and unconditionally ordered DFACS to "develop a case plan for reunification with the father of [B. N. A.]" Likewise, the court faulted the father for failing to ask DFACS for "instructions as to what he needed to do to get his child returned to him" and for failing to ask DFACS "for any visits on his own." Again, the court failed to mention its unconditional written order that "a visitation schedule be established by the Department providing for visitation between the father and B. N. A."

Georgia law requires a court to conduct a two-step analysis to determine whether a parent's rights to his or her child should be terminated.[5] First, a court must determine whether the state has met its burden of presenting "clear and convincing evidence of parental misconduct or inability."[6] Second, if the court finds such evidence, it must then determine whether "termination of parental rights is in

---

[5] See OCGA § 15-11-94 (a); *In the Interest of K. A. C.*, 229 Ga. App. 254, 255 (3) (493 SE2d 645) (1997).

[6] OCGA § 15-11-94 (a). See *Thorne*, supra at 651.

the best interest of the child."[7] To satisfy the first part of this inquiry, the evidence must establish that (i) the child is deprived, (ii) the parent's lack of proper parental care or control is causing the deprivation, (iii) this cause is likely to continue or will not be remedied, and (iv) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[8]

In this case, B. N. A.'s deprivation was established by the juvenile court's unappealed deprivation order.[9] Of greater concern, and what was not established by clear and convincing evidence, is whether the father's lack of proper parental care or control is causing the deprivation. In making this determination, the juvenile court was required to consider several factors which could negatively impact on the father's ability to care for the child, such as a drug abuse problem, imprisonment for a felony conviction, emotional neglect, and other past or present egregious conduct toward the child.[10] In addition, where the child is not in the father's custody,

> the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i) To develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) To provide for the care and support of the child as required by law or judicial decree; and (iii) To comply with a court ordered plan designed to reunite the child with the parent or parents.[11]

Although a juvenile court is not required to focus exclusively on the latter factors when a child is not in the custody of the parent,[12] the court should remain mindful that " 'the time limitation in OCGA § [15-11-94] (b) (4) (C) . . . is designed to give the parent whose rights are subject to termination sufficient time and opportunity to demonstrate his or her ability to comply with the terms of the court's order.' "[13]

In this case, there is not clear and convincing evidence that the father's lack of proper parental care or control is causing B. N. A.'s deprivation. Most troubling is the fact that only six months elapsed

---

[7] Id.

[8] OCGA § 15-11-94 (b) (4) (A).

[9] See In the Interest of D. H., 243 Ga. App. 778, 782 (534 SE2d 466) (2000).

[10] See OCGA § 15-11-94 (b) (4) (B).

[11] OCGA § 15-11-94 (b) (4) (C).

[12] See In the Interest of A. M. B., 219 Ga. App. 133, 135-136 (464 SE2d 253) (1995).

[13] In the Interest of K. A. C., supra at 254 (quoting In the Interest of B. L., 196 Ga. App. 807, 808 (1) (397 SE2d 156) (1990)).

between the time the juvenile court entered its order requiring DFACS to establish a reunification plan and visitation schedule for the father and the time of the termination hearing. During this time, the father had *no* opportunity to comply with the court-ordered plan designed to reunite him with B. N. A., because DFACS *never* established a plan. Had DFACS established the court-ordered plan, the father would have had a "clear description of the specific actions to be taken by [him] and the specific services to be provided by [DFACS] . . . in order to bring about the identified changes that must be made in order for [B. N. A.] to be safely returned home."[14] Similarly, if DFACS had complied with the court's order to establish a visitation schedule, then perhaps the father would have had a better opportunity to form a more meaningful relationship with B. N. A.

We are not saying that the father is without fault. Evidence shows that the father was previously convicted of a drug offense and is currently charged with committing other offenses.[15] Other evidence shows that the father could have taken greater initiative in reuniting himself with B. N. A. However, under the circumstances of this case, such evidence alone does not constitute clear and convincing evidence that the father is causing, and will continue to cause, B. N. A. to be deprived.

We are concerned that DFACS acted so expeditiously to completely sever the father's parental relationship with B. N. A., while at the same time ignoring the juvenile court's unqualified written order to establish a reunification plan and visitation schedule. We are equally concerned that the juvenile court permanently terminated the father's parental rights, while completely disregarding DFACS's failure to comply with its order aimed at reunifying the father with B. N. A.

For these reasons, the order of the juvenile court terminating the father's parental rights in B. N. A. is reversed.

2. In light of our conclusion in Division 1, it is unnecessary to address the father's other enumeration of error.

*Judgment reversed. Andrews, P. J., and Ellington, J., concur.*

DECIDED MARCH 5, 2001.

*Michael J. Tuck*, for appellant.

---

[14] OCGA § 15-11-58 (c) (3).

[15] The transcript reveals that, when asked about the charges, the father invoked his Fifth Amendment privilege against self-incrimination. This constitutes "'an implied admission that a truthful answer would tend to prove that [he] had committed the act.'" *In the Interest of S. B.*, 242 Ga. App. 184, 186-187 (1) (528 SE2d 278) (2000).

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, Assistant Attorneys General, Waycaster, Morris, Johnson & Dean, Cynthia N. Johnson,* for appellee.