574 S.E.2d 387 (2002)
258 Ga. App. 312
In the Interest of T.J.J. et al., children (Two Cases).
Nos. A02A1400, A02A1401.
Court of Appeals of Georgia.
November 8, 2002.
*388 Chandler R. Bridges, for appellant (case no. A02A1400).
Saunders P. Jones IV, Marietta, for appellant (case no. A02A1401).
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., Robert G. Nardone, for appellee.
PHIPPS, Judge.
In separate appeals, the mother and father of T.J.J. and T.J. challenge the termination of their parental rights.[1] Each contends that the evidence was insufficient to support a finding of parental misconduct or inability as provided in OCGA § 15-11-94.[2] In the mother's case, Case No. A02A1400, we agree and reverse and remand. In the father's case, Case No. A02A1401, we agree that the evidence was insufficient with respect to T.J.J. Termination of his parental rights to T.J., however, was authorized on an independent basis. Accordingly, we affirm his case in part and reverse in part. The father's case is also remanded.
T.J.J. was born on February 16, 1999. A month later, the juvenile court determined that she was deprived and granted temporary custody to the Department of Family & Children Services (DFACS) based on its findings that her mother was 16 years old, that she had been in the custody of DFACS since 1989, and that she was unable to provide adequate supervision and care for her child. That order was not appealed. DFACS developed reunification case plans for T.J.J.'s mother and father. Six months later, the juvenile court ordered the father to submit to a psychological evaluation. He complied.
T.J. was born on April 8, 2000, and was immediately placed in DFACS's care. Six days later, DFACS filed a deprivation petition on the grounds that her mother was a juvenile, that she had been in the custody of DFACS since 1989, and that she was unable to provide adequate supervision and care for T.J. On that same day, DFACS filed a petition to end reunification services to the parents with both children.
On June 30, 2000, DFACS filed a petition to terminate the mother's and father's parental rights to both children on grounds of parental misconduct or inability as provided in OCGA § 15-11-94. As an additional ground for terminating the father's parental rights to T.J., the petition alleged that the father had failed to legitimate her.
At the termination hearing held August 25, 2000, evidence showed that after T.J.J. was born, the mother and the child were immediately placed in separate foster homes. A month later, the mother left her foster home and did not contact the DFACS caseworker. The caseworker thus placed her on "runaway" status until August 1999, when she learned that the mother was in jail. Upon the mother's release, she was committed to the Department of Juvenile Justice (DJJ) because of her "running," transferred to a youth detention center, and then sent to boot camp. From there, she was returned to her foster home in March 2000.
The following month, the mother gave birth to T.J. The caseworker testified that DFACS began having "difficulties" with the mother regarding curfews at the foster home. She wanted to live with the children's father, but that was not an appropriate DFACS placement. In May 2000, the mother left the foster home again. The caseworker did not know her whereabouts and thus placed her on "runaway" status until she discovered in July 2000 that she was living with the children's father. The mother became 18 years old on August 7, 2000, and DFACS closed her own case the following day.
*389 The mother's reunification plan had called for the mother to have regular contact with T.J.J., learn parenting skills, assist in making plans for T.J.J. while she was in foster care, obtain and maintain mental health treatment, continue her education, demonstrate an ability to remain drug free, cooperate with and follow the rules of foster care placement, assist DFACS in making plans for her own future, maintain contact with DFACS, and cooperate with the DJJ until released from commitment there. The DFACS caseworker reported that the mother had failed to comply fully with that plan, citing the mother's failure to remain in contact with her and her discontinuance of mental health counseling. The mother testified that she could have contacted DFACS "every so often just to let them know ... that [she was] all right." But "as far as contacting them everyday, [she had] nothing [to] say to somebody who's not trying to help [her]." Explaining her refusal to continue counseling provided by DFACS, the mother recounted that she had been going to counseling since she was five years old, but had become "fed up" because "every time you turn around it's a different person. I'm tired of explaining my life to different people, strangers who I don't know, don't stay with me within a month or two, and then you move to a next one."
The caseworker reported on the mother's contact with her children, testifying that the mother had visited T.J.J. a few times before leaving her foster home, but had not done so during the times she was on "runaway" status or incarcerated. When the mother began living with the children's father, however, she resumed the visits scheduled twice each month. The children's foster mother testified that during the visits, T.J.J. was somewhat detached from her mother, but she accounted for the child's reaction as a lack of contact between the two, recalling that both children had been living with her since birth. While the foster mother described T.J.J. as "technically a healthy child," she stated that the child had developmental delays. She therefore preferred that T.J.J., along with her sister, be placed not with their mother and father, but with "more mature, experienced parents."
The juvenile court terminated the mother's and father's parental rights to both children. Because no judicial determination has more drastic significance than permanently severing a parent-child relationship, such severance must be exercised cautiously and scrutinized deliberately.[3] Termination of parental rights under OCGA § 15-11-94 requires a juvenile court to find that there is clear and convincing evidence of parental misconduct or inability and that termination is in the child's best interest. Subsections (a) and (b)(4)(A) of that Code section require a court to determine parental misconduct or inability by finding each of four factors: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[4] On appeal, we view the evidence in the light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated.[5]
Case No. A02A1400
1. The mother contends that it was not established by clear and convincing evidence that the cause of the deprivation was likely to continue.[6] Citing the principle that in determining whether such conditions of deprivation are likely to continue, the juvenile court may consider a parent's past conduct,[7] DFACS points out that the mother failed to comply fully with the reunification plan and asserts that the mother's own choices led to her absences from T.J.J.'s life.
*390 Nevertheless, there must also be clear and convincing evidence that the cause of that deprivation is likely to continue.[8] We find no such evidence here. The cause of the deprivation was attributed to the fact that the mother was a juvenile, that she had been in DFACS's custody since 1989, and that she was unable to provide adequate supervision and care for her child. Yet, the evidence revealed that the mother had very recently reached the age of 18, was no longer in DFACS's custody, and had begun stabilizing her life. She had continued her relationship with the children's father for seven years. She testified that he was her "best friend" and her children's biological father. They had established a home together in the downstairs portion of a five-bedroom home owned by the father's brother, where they rented two bedrooms and one bathroom and shared the home's kitchen with the father's brother.
The mother had obtained full-time employment at a restaurant and testified that while she did not "get over $100 on [her] check," she earned $70 to $100 each night in tips. In addition, she was contemplating a second job, completing her high school education, and enrolling in Job Corps.
The mother had attended family planning classes. For supplemental supervision and care of T.J.J. and T.J., she planned to accept the help offered by the children's grandmothers, who were nurses. The mother was aware of T.J.J.'s special needs and testified that she could handle them.
While there was evidence that T.J.J. had not bonded with her mother, the obstacles that had prevented them from spending time together had been resolved. In addition, the mother acknowledged that she had made mistakes in the past and maintained that she had learned from them.
While it is correct that "`(p)ast conduct of the mother may reflect whether the conditions of deprivation are likely to continue' and that a mother's `recent attempts to put her life in order' may be unconvincing," these general statements are not absolutes and do not fit every case.[9] Having been separated from T.J.J. and T.J. since their births, this mother has not been given an opportunity to parent her children. However, the circumstances that prevented that opportunity and contributed to her children's deprivation have changed significantly. She is no longer a minor and no longer in DFACS's custody. She has taken steps consistent with providing adequate care and supervision for her children, including securing employment, obtaining housing, planning a future with her children and their father, and remedying her mistakes. Her progress cannot be characterized as mere "positive promises which are contrary to negative past fact."[10] Termination of parental rights is a "remedy of last resort" that cannot be sustained where there is no clear and convincing evidence that the cause of the deprivation is likely to continue.[11] Because that evidence was not clear and convincing in the mother's case, termination of her parental rights to her two children was error.[12] We reverse the judgment and remand the case for the establishment of a reunification plan, subject to whatever disposition is warranted by future events and those occurring since the last termination hearing.[13]
2. Our decision in Division 1 renders the mother's remaining claims of error moot.
Case No. A02A1401
3. Challenging the termination of his parental rights under OCGA § 15-11-94, the father contends that there was no clear and convincing evidence that the deprivation was *391 likely to continue or that continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to the children.[14]
(a) In terminating the father's parental rights to T.J., the juvenile court expressly relied also upon OCGA § 15-11-96(i),[15] which provides procedures for an "abbreviated termination" of the parental rights of a biological father who has failed to petition to legitimate a child.[16] DFACS's termination petition specifically warned, pursuant to OCGA § 15-11-96(e),[17] that the father would lose all rights to T.J. and that he would not be entitled to object to the termination of his parental rights to her unless he filed a petition to legitimate her within 30 days from receipt of the petition. The father admitted at the hearing that he had not sought to legitimate T.J. His failure to do so constituted an adequate basis for the juvenile court to terminate his parental rights to her.[18] On appeal, the father makes no argument on this issue. Consequently, we affirm the termination of his parental rights to T.J.[19]
(b) We next consider the father's contention that there was no clear and convincing evidence that the cause of T.J.J.'s deprivation was likely to continue or that continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to T.J.J. The juvenile court based its determination that T.J.J. was without proper parental care and control on its findings that the father had neglected her and that the father had a medically verifiable deficiency that rendered him unable to provide for her needs. The juvenile court also relied on its finding that the father had failed to develop and maintain a meaningful parental bond with T.J.J., had failed to care for and support her, and had failed to achieve any goal of his reunification plan other than maintaining regular visits with the child.
The psychologist who evaluated the father testified that the father's immaturity, limited cognitive abilities, and limited coping skills would "impact" his ability to parent because it would be "very difficult" for him to problem-solve. She did not testify, however, that any deficiency rendered him unable to provide adequately for T.J.J.[20] Rather, the psychologist stated that the father "did not lack the cognitive ability to understand what it would take to raise a child and to understand the complexity of responding to a child's developmental needs and taking car[e] of them." According to the psychologist, the father had a strong desire and a sense of duty to take care of T.J.J. She stated that with "a lot of support" from others, such as the child's grandparents or the child's mother, a person with the father's intelligence quotient could properly parent a child. Further, she stated, if the father held a job for "a significant length of time," then that would indicate his ability to cope with life and deal with ongoing problems. And, she continued, by establishing a home, he would "indicate that he [had] mastered some of [his] deficits."
Accordingly, there was evidence that the father was not rendered unable to care for T.J.J. For six months, he had worked at two restaurants six days a week, earning $1,100 every two weeks. While the father conceded that before securing that employment, he had changed jobs frequently, he explained that he had done so for higher pay. Two weeks before the hearing, the father obtained housing (as described by the mother in Division 1, supra) and furnished one of the *392 bedrooms with cribs. He had scheduled his day off to coincide with visitation day with his children. Moreover, in caring for T.J.J., the father had the support of his parents, T.J.J.'s mother, and T.J.J.'s maternal grandmother.
The father's reunification plan called for the father to legitimate T.J.J., maintain regular contact with her, assist in making plans for her, learn and demonstrate appropriate parenting skills, maintain employment, obtain housing large enough for a family, financially support T.J.J., and maintain contact with DFACS. The father's petition to legitimate T.J.J. was granted in March 1999. Evidence showed that he had attended parenting classes, had maintained employment, and had obtained suitable housing. And it is uncontroverted that the father maintained regular visitation with T.J.J., having missed only three of the twice-monthly visits in approximately eighteen months. However, the father admitted that he had not communicated with the caseworker other than during the scheduled visits with the children, and the DFACS caseworker added that he had failed to support T.J.J. financially (although he had periodically provided clothes for T.J.J.).
Under the circumstances of this case, even considering the evidence that reflects negatively on the father's past, we conclude that there was not clear and convincing evidence that the causes of T.J.J.'s deprivation were likely to continue.[21] There was evidence that the father was not rendered unable to care for T.J.J. properly.[22] And the evidence did not demonstrate that the father had "failed significantly" to maintain a parental bond with T.J.J. or to comply with his reunification plan, in light of the progress shown.[23] Accordingly, with respect to T.J.J., we reverse the judgment and remand the case for the establishment of a reunification plan, subject to whatever disposition is warranted by future events and those occurring since the last termination hearing.[24] We do not reach the father's remaining argument.
Judgment reversed and case remanded in Case No. A02A1400. Judgment affirmed in part and reversed in part, and case remanded in Case No. A02A1401.
ANDREWS, P.J., and MIKELL, J., concur.
NOTES
[1] The appellant father, referred to herein as "the father," is the legal father of T.J.J. and the putative father of T.J.
[2] Formerly OCGA § 15-11-81.
[3] In the Interest of K.M., 240 Ga.App. 677, 679-680, 523 S.E.2d 640 (1999).
[4] In the Interest of T.B., 249 Ga.App. 283, 285-286(1), 548 S.E.2d 45 (2001).
[5] Id. at 286, 548 S.E.2d 45.
[6] See OCGA § 15-11-94(b)(4)(A)(iii).
[7] See In the Interest of T.B., supra.
[8] OCGA § 15-11-94(a), (b)(4)(A)(iii); In the Interest of T.B., supra at 286-287, 548 S.E.2d 45.
[9] (Footnote omitted; emphasis in original.) In the Interest of T.B., supra at 286, 548 S.E.2d 45..
[10] (Footnote and punctuation omitted.) Id. at 287, 548 S.E.2d 45.
[11] In the Interest of K.M., supra at 680, 523 S.E.2d 640
[12] See In the Interest of B.F., 253 Ga.App. 887, 560 S.E.2d 738 (2002); In the Interest of T.B., supra at 283-287, 548 S.E.2d 45; In the Interest of K.M., supra at 680-681, 523 S.E.2d 640.
[13] See In the Interest of K.M., supra at 681, 523 S.E.2d 640.
[14] See OCGA § 15-11-94(b)(4)(A)(iii), (iv).
[15] Formerly OCGA § 15-11-83(i).
[16] See In the Interest of J.K., 239 Ga.App. 142, 146(2), 520 S.E.2d 19 (1999).
[17] Formerly OCGA § 15-11-83(e).
[18] In the Interest of S.L.H., 247 Ga.App. 594, 544 S.E.2d 518 (2001); In the Interest of D.M., 244 Ga.App. 361, 362-363(1), 535 S.E.2d 7 (2000).
[19] In the Interest of S.L.H., supra; In the Interest of D.M., supra.
[20] See OCGA § 15-11-94(b)(4)(B)(i) (in determining whether a child is without proper parental care and control, the court shall consider, without being limited to, whether a medically verifiable deficiency of the parent's physical, mental, or emotional health "render[s] the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child").
[21] See In the Interest of T.B., supra; In the Interest of B.F., supra (although father had not supported child financially since child was placed in DFACS's custody and had not attended any parenting class, evidence was not sufficient to show that father's past misconduct which deprived the child of care was likely to continue, where no evidence existed to show a likely recurrence of father's incarceration, no evidence established any recent chronic alcohol or drug abuse, father was employed, had made attempts to find suitable housing for child, and a parental bond existed between father and child).
[22] See In the Interest of A.A., 252 Ga.App. 167, 172(2)(c), 555 S.E.2d 827 (2001).
[23] See OCGA § 15-11-94(b)(4)(C); In the Interest of J.E.E., 235 Ga.App. 247, 249, 509 S.E.2d 147 (1998) (when determining whether to terminate parental rights, it is appropriate to consider a parent's progress in completing the reunification plan).
[24] See In the Interest of K.M., supra.