638 S.E.2d 412 (2006)
In the Interest of T.E.T., a child.
No. A06A1183.
Court of Appeals of Georgia.
November 6, 2006.
*413 Banks & Riedel, Sarah Hinkle Riedel, Stephanie D. Burton, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charles M. Johnson, for appellee.
ADAMS, Judge.
The father of T.E.T. appeals from an order of the Juvenile Court of Dodge County terminating his parental rights. He challenges the sufficiency of the evidence and contends that termination is not in the best interest of the child.
On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. In the Interest of S.H., 251 Ga.App. 555(1), 553 S.E.2d 849 (2001). "This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met." (Citation omitted.) In the Interest of C.R.G., 272 Ga.App. 161, 161-162, 611 S.E.2d 784 (2005). We are ever mindful, however, that "[b]ecause no judicial determination has more drastic significance than permanently severing a parent-child relationship, such severance must be exercised cautiously and scrutinized deliberately. [Cit.]" In the Interest of T.J.J., 258 Ga.App. 312, 314, 574 S.E.2d 387 (2002).
T.E.T. was born September 7, 2002. T.E.T. was placed in the custody of the Dodge County Department of Family and Children Services (the "Department") after both he and his mother tested positive for cocaine at the time of his birth. The mother stipulated that the child was deprived, and an order to that effect was entered and the child was placed in foster care. That order was not appealed.
Hall, the father of T.E.T., initially denied paternity when the Department first contacted him on September 9, 2002.[1] The Department developed a reunification case plan for the mother, but Hall was not made a part of the plan. On May 8, 2003, a child support action was filed against Hall, and he submitted to DNA testing on June 23, 2003. On September 18, 2003, the Department filed a motion to change the plan to nonreunification/adoption based on the mother's failure to comply with her case plan. In the motion, the Department noted that Hall had not been involved in the case and that the child had been in foster care for over 12 months. However, the caseworker testified that Hall did contact her on the day the hearing was held on the motion and told her he thought he was the father of T.E.T. and asked her what he needed to do. The results of the paternity tests still had not come back at that point, and the caseworker advised him to contact legal services. Because of several mix-ups in the paperwork, the child was not tested until October and the results showing Hall to be the biological father of the child were not known until late October. Hall was notified of those results sometime in November.
On November 12, 2003, the juvenile court approved and adopted the nonreunification/adoption plan as to the mother. In early December 2003, several weeks after Hall learned the results of the paternity testing, he contacted the caseworker and inquired about visiting the child. He also told her that he had contacted an attorney about filing a petition to legitimate the child but nothing had been filed at that point. The caseworker told him that because he had not yet legitimated the child, she would only approve visitation with the child if the mother agreed for him to go with her to the visits. Hall began to visit the child in December 2003, and over the course of the next five or six months, attended approximately seven out of nine of the scheduled visits.
A petition to terminate the parental rights of both the mother and Hall was filed on January 26, 2004. Hall filed a petition to legitimate the child on February 27, 2004. *414 On March 1, 2004, Hall was ordered to begin paying $179 per month for the support of the child. A final order of legitimation was entered on March 11, 2004.
The Department contracted with Horizon's Family Services to conduct a home evaluation on Hall on March 17, 2004. At that time, Hall was renting a bedroom from his sister and did not wish to have his current living situation evaluated because he was in transition to other housing. The evaluator requested that Hall obtain suitable housing within a few weeks. Hall failed to comply, and the evaluator issued a report recommending against placing T.E.T. with Hall based on his failure to comply with the housing request, his refusal to take a drug test and his failure to report his income.
A hearing was conducted on the termination petition on June 17, 2004. As stated above, caseworkers assigned to the case testified that Hall began to regularly visit with T.E.T. after he learned the results of the paternity tests, and that he came to at least seven out of the nine scheduled visits. Although the caseworker testified that she did not observe any "special bonding" between Hall and T.E.T., she also testified that Hall brought clothes and toys to the visits and that he did interact with T.E.T. when he was with him. Testimony was also presented that a case plan was never implemented for Hall.
Hall testified at the hearing that he had recently purchased a three-bedroom, two-bath furnished trailer, and that it was ready to be occupied except that it had not yet been secured on the land where he planned to locate it. Hall testified that although the trailer was not ready, one of his other sisters had a large home nearby and both he and T.E.T. could live with her until the trailer was ready. He also testified that both of his sisters who lived nearby would help him care for T.E.T. Hall's sister also testified and confirmed that she has a five-bedroom house nearby and that Hall and T.E.T. could live with her while the trailer was being finished and that she would help with T.E.T.'s care while Hall was at work.
Hall testified that he did submit to a drug screen, and stated that he had never used illegal drugs. Hall further testified that he contacted an attorney shortly after he learned the reports of the paternity testing and that the attorney drafted the legitimation petition but never filed it. He testified that when he realized the petition was not going to be filed, he contacted his present counsel, who shortly thereafter filed the legitimation petition. He also said that he had operated an automobile paint and body shop for approximately 15 to 20 years, and that he had sufficient financial resources to take care of T.E.T. However, testimony was also presented that Hall had not been filing income tax returns from the income he earned from his business, so his income could not be verified. Testimony was also presented that Hall had not paid all child support that was owing at that time, although that order had only been in place since March and the amount in arrears was somewhat unclear.
The mother's parental rights were terminated after the hearing, but Hall was given an additional 60 days to complete the set-up of his mobile home, to have a home study and also to submit to a drug test. A final hearing was held on August 26, 2004. Although Hall did not have the residence completed within the 60 days allowed by the court because of problems with locating it where he had originally planned, the trailer was ready for occupancy by the hearing date. The caseworker who visited the home on that day found the home to be appropriate for a two-year-old child, but nevertheless recommended termination of Hall's parental rights because of "what it will do to that child to move him from the home [he has had since birth] and the only family he knows." The caseworker further noted that Hall had not requested visitation and had not visited with the child since the June hearing. However, on cross-examination she did testify that the original visitation had been set up so that Hall visited with the child only with the mother present, that no regular visitation schedule had ever been set up for Hall, and that Hall had tried to call her at least once and that she had called him back but was unable to reach him. She also testified that Hall had submitted to a drug test and that the results of the test were negative.
*415 Hall testified concerning why there was a delay in setting up the trailer, but stated that everything was now ready for T.E.T. to live with him. He also testified that he had made arrangements for someone to care for the child while he worked. Although he did not provide any documentation to support his testimony, he testified that he has spent about $7,000 just getting the home ready for the child, and that he was financially capable of paying for day care and taking care of the child. He also testified that he loved T.E.T. and opined that he could best raise the child.
The foster parents both testified at the hearing concerning how they had bonded with the child whom they had raised since he was born, and of their love for the child and their desire to adopt him.
Following the hearing, the juvenile court entered an order terminating Hall's parental rights based on his failure to have his residence completed within the time allowed by the Court, failure to visit the child or inquire about the child since the June hearing, and failure to pay child support on a regular basis. The trial court also found Hall to be an unfit parent.
Georgia law provides for a two-step process that must be followed in determining whether to terminate parental rights. OCGA § 15-11-94 requires that the trial court "first determine whether there is present clear and convincing evidence of parental misconduct or inability[.]" Parental misconduct or inability is determined under the four criteria set forth in OCGA § 15-11-94(b)(4)(A)(i-iv). Those four factors are: (1) the child is deprived; (2) the lack of proper parental care or control by the parent whose rights are being terminated is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors are shown to exist by clear and convincing evidence, then the court must also determine whether termination of parental rights is in the best interest of the child, "after considering the physical, mental, emotional, and moral condition and needs of the child, . . . including the need for a secure and stable home." OCGA § 15-11-94(a).
Parental misconduct or inability. We agree with the father that there was insufficient evidence to support the finding of parental misconduct or inability, as set forth more fully below.
Deprivation. As to the first factor, Hall's failure to appeal the juvenile court's order adjudicating T.E.T. as a deprived child means he is bound by that determination. In the Interest of T.B., 267 Ga.App. 484, 486, 600 S.E.2d 432 (2004); In the Interest of J.T.W., 270 Ga.App. 26, 33(2)(a), 606 S.E.2d 59 (2004).
Lack of proper parental care or control as the cause of deprivation and the cause of the deprivation is likely to continue. The evidence was insufficient, however, as to both the second and third factors. OCGA § 15-11-94 sets forth several conditions that a juvenile court may consider in determining whether a lack of proper parental care or control caused the child's deprivation. OCGA § 15-11-94(b)(4)(B)(i)-(vi). The only factor that arguably applies to Hall is factor (v), involving the physical, mental or emotional neglect of the child in that he did not seek to form a relationship until the child was over one year old. Moreover, since the child was not in Hall's custody, it is also relevant to consider the factors listed in OCGA § 15-11-94(b)(4)(C). Under that section,
the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i) To develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) To provide for the care and support of the child as required by law or judicial decree; and (iii) To comply with a court ordered plan designed to reunite the child with the parent or parents.
As to this last factor, we note that a reunification plan was never implemented for Hall. We also note that the termination petition was filed within several months of Hall being notified that he was the biological father of *416 the child. Moreover, even before the results of the paternity tests were known, Hall contacted the caseworker and asked what he should do in regard to the child now that he believed the child was his. She advised him to seek legal counsel, which he did. The evidence also shows that there was a delay in obtaining the results of the paternity testing, which was not attributable to Hall, and that once these results were made known to him in November, he again initiated contact with the caseworker seeking to visit T.E.T. Hall was allowed to begin visiting the child, and he did so, although there was no set visitation schedule and he was dependent on the mother to schedule the visits and allowed to visit the child only with the mother because he had not yet legitimated the child. Further evidence was presented that Hall's original attorney did not file a legitimation petition on his behalf, and that Hall contacted another attorney who filed the petition shortly thereafter. The caseworker who supervised the visits testified that Hall brought clothes and toys to the child and interacted with T.E.T. during the visits. Once the child was legitimated and the Department indicated it would do a home evaluation, Hall purchased a trailer so he and the child would have a place to live, began making child support payments as ordered by the court, and subsequently made arrangements to move in with a sister with a larger house once he was delayed in getting the trailer set up. Thus, at the time of the June hearing, Hall was seeking both to establish a relationship with T.E.T. and to provide at least some support for the child, although there was evidence he was partially in arrears on his payments at that time.
Moreover, we also consider the specific findings made by the juvenile court to support the termination. The court found: Hall did not set up his residence in the time frame allowed by the court, he did not "once" call or ask about the child during the time between the June and August hearings, and he did not regularly pay support for the child. The juvenile court also found Hall to be an unfit parent. As for Hall's failure to meet the six-week deadline in setting up the trailer, Hall explained to the court why there was a delay and how he had to change his plans when the person who was supposed to handle the set-up failed to act. And although the trailer was not ready to be occupied during the time period set by the court, it was ready and found to be an appropriate home for the child by the time of the hearing. Moreover, and perhaps more importantly, even at the time of the first termination hearing in June, Hall offered evidence, through his own testimony and that of his sister, that he had a suitable place for both himself and the child to live while his trailer was being set up. However, the juvenile court apparently did not consider that evidence in deciding that Hall's failure to meet the court's deadline warranted the termination of his parental rights.
Likewise, the evidence does not support the juvenile court's finding that Hall did not "once" call the caseworker to ask about the child or ask to visit the child. To the contrary the caseworker testified that Hall did call her on at least one occasion, and that she tried to return his call and did not reach him. Moreover, the juvenile court also failed to consider that a regular visitation schedule had never been established for Hall to visit with the child and that, pursuant to the guidelines established by the Department, he had previously been dependent on the mother to set up the visits and had only been allowed to visit the child with the mother. However, following the June hearing, he had been ordered not to have contact with the mother and the mother could no longer visit the child since her rights had been terminated. Although Hall should have been more diligent in pursuing visitation in light of these changes, we cannot say that this failure alone, especially considering he had been regularly visiting with the child within the strictures set by the Department and had been attempting to establish a bond with the child before that time, constituted clear and convincing evidence necessary to support the termination of his parental rights.
As to his failure to pay child support on a regular basis, it does not appear that any new evidence was offered at the August hearing on this issue, and as noted above, at the time of the previous hearing Hall was not seriously behind on his support payments. *417 Hall continued to testify that he owned his own business and was capable of supporting T.E.T., including spending approximately $7,000 to provide a home for T.E.T. Lastly, there was nothing to suggest that Hall was unfit to parent T.E.T. To the contrary the evidence showed that Hall had owned and worked in the same business for a number of years, that he had two adult children by a previous marriage with whom he maintained a good relationship, that he had actively participated in their care when they were young, that he continued to help support his daughter who was in college, that he was a "good" cook, that he did not use drugs or have any substance abuse issues, and that he had a large and supportive family.
In sum, although the evidence here does not demonstrate that the father acted in an exemplary manner in establishing a relationship with his child and although he undoubtably should have taken greater initiative in this regard, given all the circumstances here, we find the evidence falls short of meeting the clear and convincing standard necessary to uphold the termination of Hall's parental rights. In the Interest of B.N.A., 248 Ga. App. 406, 407(1), 546 S.E.2d 819 (2001). We acknowledge that there is little question that both the Department and the juvenile court were attempting to act in the best interest of T.E.T. by keeping him with the family he had known since birth, and we note the difficulty in deciding cases of this type. "`While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship.' In the Interest of K.M., 240 Ga.App. 677, 680-681, 523 S.E.2d 640 (1999)." In the Interest of A.A., 252 Ga.App. 167, 173(2)(c), 555 S.E.2d 827 (2001).
Judgment reversed.
BLACKBURN, P.J., and MIKELL, J., concur.
NOTES
[1] Hall testified that he did not know T.E.T.'s mother was pregnant until shortly before T.E.T. was born and that he did not think he was the father because he knew the mother was also dating other men.