**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**November 30, 2012**

# In the Court of Appeals of Georgia

A12A1331. IN THE INTEREST OF: C. S. et al., children.

ADAMS, Judge.

Following our grant of his application for discretionary review, the father of Ca.S. and Ch.S., who were born on December 12, 2007 and November 24, 2008, respectively, timely filed this appeal from an order of the Juvenile Court of Crawford County terminating his parental rights. On appeal, he challenges the sufficiency of the evidence to support the order of termination and also contends the juvenile court erred by finding that it was not in the best interests of the children to be placed with his relatives, Phillip and Patricia Smith.

"On appeal from a juvenile court's decision to terminate parental rights, we review the evidence in the light most favorable to the court's decision and determine whether any rational trier of fact could have found by clear and convincing evidence

that the parental rights should be terminated." (Footnote and punctuation omitted.) *In the Interest of E. S. K.*, 299 Ga. App. 35, 35-36 (681 SE2d 705) (2009).

The hearing on the termination petition was held over the course of several days and months, and several different case workers from different counties testified because the mother frequently moved.[1] The first hearing was held on January 20, 2011 and the first witness to testify was Centralia Coney, who worked for the Twiggs County Department of Family and Children Services (DFCS). Coney testified that she made several visits to the mother's home in May 2009 to check on the mother's compliance with an order issued in Jones County that required the maternal grandmother to be drug tested before she could have contact with the children. Coney further testified that on each occasion she visited, some or all of the children were unsupervised and the adults in the household were all asleep although it was midday.[2]

---

[1] The mother had custody of the two children appellant fathered plus a slightly older child who had a different biological father. The parental rights of all three parents were terminated in these proceedings, but only the appellant's appeal is before us.

[2] On the first visit Coney observed Ca.S. playing naked in or near a bucket filled with water, in which, Coney testified, he could have easily become submerged and on the second visit all three children were unsupervised in the living room, eating out of a bowl and surrounded by clothes, shoes, food and cigarette butts which littered the floor.

Further, the maternal grandmother, who still had not been drug tested, was present in the home both times and on one occasion the mother told Coney that the grandmother was supposed to be supervising the children because she was tired from moving. During this time, Coney also received several calls from a neighbor who was in law enforcement concerning his observations of late night parties, men coming in and out of the house, and the possibility of the children being left alone.

In May or June 2009, DFCS received a report that one of the children might have been sexually abused by a mentally challenged maternal relative, and a shelter order for the children was entered in June 2009. A reunification plan was instituted at that time for the mother but the appellant was not given a case plan because he did not attend the family team meeting. Coney testified that the appellant did approach her and ask her what he should do but she could not recall if he actually worked a plan while the case was pending in Twiggs County. Further, she testified that the appellant had transportation issues and problems getting off work to meet with her during this time. She also testified that the appellant tested positive for drugs on one or two occasions, but she could not recall the drug or drugs that were detected on the tests.

The hearing resumed on March 3, 2011. At that hearing, Laquarila Williams, who worked for Crawford County DFCS, testified she became involved with the case after it was transferred there in October 2009 for foster care services. She said a court ordered reunification plan was put into place on October 15 and that both the mother and appellant made some progress on the plan in the following months but that neither the mother nor the appellant achieved all their goals. In April 2010, DFCS decided to seek a concurrent case plan with a primary goal of reunification and a secondary goal of adoption. In August 2010, DFCS sought a non-reunification plan primarily to seek permanency for the children and to allow the foster parents to adopt them. However, Williams also testified that prior to the change to non-reunification the children were being transitioned back to the mother but that the plan was changed after DFCS discovered that the mother was dating a convicted child molester and possible gang member, although she did reiterate that the main issue at that time was to provide some stability for the children who at that time had been in foster care for 22 months.

Williams also testified that the appellant had undergone a psychological evaluation as mandated by his reunification plan, but that at the time non-reunification was sought he had tested positive for controlled substances in the

4

preceding months, failed to obtain independent housing, and had not completed substance abuse and domestic violence assessment programs or anger management and parenting classes. Further, as of the date of the hearing, the appellant was $4066 in arrears on his court ordered child support. Williams also testified that the decision to change the appellant's case plan to non-reunification was based in part on the fact that he had quit working on his case plan because of his employment situation and because he had gotten into an altercation at his previous job. Although she agreed that the appellant had completed his parenting and anger management classes as well as the drug treatment portion of his plan after the decision to seek non-reunification was made, she said that she had not changed her mind about the decision to seek termination of his parental rights because of the positive drug test and the altercation at work, which occurred just several months prior to his completion of the drug program. She also pointed to the lack of progress on his case plan at the time that termination of his rights was sought and lack of cooperation with DFCS early on and testified that the appellant was not currently employed and reiterated that he was not paying child support. She did agree, however, that appellant interacted well with his children, and also testified that the fact that he resided with his mother was not really a problem because her home had been denied for placement because she had health

5

problems, not because it had been deemed inappropriate. But she also testified that if the appellant's rights were not terminated it would delay the children having permanency and that she would be concerned with placing the children in an environment where he was still testing positive for drugs.

Williams also testified about possible placement with relatives and several home evaluations were introduced, including that of the appellant's relatives Patricia and Phillip Smith, which showed that the Smiths had not been approved after an evaluation conducted by DFCS in Jones County where they resided.

Beth Tillery, a family coach in the visitation program run by Lighthouse for Families at the Methodist Children's Home in Macon, Georgia, testified concerning the appellant's visitation with his children. According to Tillery, appellant, along with his mother, visited the children almost every week, and she never observed any inappropriate or dangerous interactions between the appellant and the children, although she did note that he did not always follow through on discipline and was more like a friend to the children than a parent. However, she also testified that the appellant was provided only "regular" supervision during his visits, and that he did not receive the more intensive instruction that was part of the mother's plan. She also testified that DFCS discontinued Lighthouse's services after the decision was made

6

to seek non-reunification, and that while Lighthouse supported non-reunification for the mother, Lighthouse did not make a recommendation for either father.

Jeannie Powell, another Lighthouse employee, testified that she also observed the appellant's visits with his children on several occasions and that the appellant had positive interactions with his children and seemed to assume his parental responsibilities, such as changing the youngest child's diaper and taking his other son to the bathroom. She also observed him help the oldest child, although she was not his biological daughter. Powell, like many of the witnesses, had primarily been involved with providing counseling for the mother and she said she thought the mother was making progress on her plan but changed her opinion after she found out that the mother was involved with a convicted child molester and possible gang member. She also testified that the children had formed an attachment to the foster parents and for that reason she felt it would be detrimental for them to be placed with the paternal family members who had been considered as possible placements for the children. Further, she said it would probably be most problematic to remove the appellant's youngest child, who had been with the foster parents most of his life.

The next, and final hearing, was conducted on June 29, 2011. Williams testified again at this hearing and recounted the drug tests that appellant had failed, although

she also acknowledged that he had not been drug tested by DFCS since April 2010. She also testified that her understanding was that he was now employed with a private contractor and that he still resides with his mother. Further, she testified that to her knowledge he had never completed the drug treatment program or been able to refrain from using marijuana as required by his reunification plan. However, on cross-examination she was shown the certificates appellant received after completing all the courses required by his original reunification plan, including a certificate he received when he completed his substance abuse education plan in November 2010. When asked what portion of his case plan had not been completed, Williams pointed to the fact that appellant had not completed the requirements prior to DFCS seeking non-reunification and also said it was possible he had not completed individual counseling and that he had not obtained independent housing. When asked how the children would be harmed if the appellant's rights were not terminated, she once again cited the need for permanency and how that would be delayed if DFCS had to "start over with drug screens, housing and all that would have to be monitored for another six months period." She also reiterated that the Smiths would not be considered for placement because their original home evaluation was denied by Jones County DFCS.

Williams also testified that it would be in the best interests of the children for them to remain with their current foster parents because their current environment was safe, stable, drug free and they had been there for two years and were bonded to the foster parents and accustomed to the structure they provided. Further, she testified that the foster parents were willing to adopt the children and said that if the children were given to the appellant, it would be yet another removal from what they had come to consider as their home.

When asked how the appellant was currently depriving the children, Williams pointed to her lack of knowledge concerning his income, her lack of knowledge concerning his current drug use and his lack of independent housing. She also testified that the appellant owed $4525 in back child support as of the date of the hearing, but noted that he had made several child support payments since the March hearing, and the record reflects that appellant had paid $1691 in child support during the preceding three months.

Appellant also testified at the hearing, and the certificates showing that he had completed anger management and parenting classes as well as a drug education course were introduced into evidence. Further, he testified he thought the treatment center would send those certificates to DFCS and that was why he had not previously

provided them to the agency. He also testified that he had been employed full time by Charles Bass Roofing for 12 to 13 months, and that he was hired by Charles Bass about a week after he left his previous employment. Further, he testified that he attended both Alcohol Anonymous (AA) and Narcotics Anonymous (NA) meetings at the Phoenix Center for seven months, and that he quit using drugs after he started going to the Phoenix Center.

Appellant also testified that he now had a roommate and no longer lives with his mother. He admitted he got behind on his child support, but explained that was because he was taking time off work to attend classes and said he had been trying to catch up for the last several months. He also testified that he visits his children every other Monday as scheduled, and that he only missed a few visits right after he started working for his former employer, who would not let him off work at lunch. He also said that he requested a case plan from the beginning when the children first went into foster care in Twiggs County, although he was not given a case plan at that time because the case was transferred to Crawford County.

Dr. Joan Allison Lanum, a clinical psychologist, also testified. She had provided therapy for the oldest child, but did not provide therapy to the appellant's biological children. She testified that Ca.S. and Ch.S. would have a difficult time

10

transitioning from foster care because they were removed from their mother at such an early age. However, she further testified that she "assumed" that the boys viewed the foster mother as their mother, and she did not offer any testimony concerning the children's relationship with appellant. Like several of the other witnesses, her testimony pertained primarily to the children's relationship with the mother.

Based on the foregoing, the juvenile court concluded that the parental rights of the mother and both fathers should be terminated. Specifically, concerning appellant, the juvenile court made the following findings: that appellant visited with his children and that the visits had gone well, although "some testimony showed that he plays with the children as a friend but shows equal attention to all the children." The court further found that the appellant did not have independent housing, and noted that he moved from his mother's home about four months before the final hearing "but failed to notify any parties about his move." The court also noted that appellant had completed his parenting class prior to the filing of the termination petition, and that he had completed a substance abuse program and an anger management class after the petition was filed but that he had failed to furnish his completion "certificates to DFCS as previously required . . . when he had a reunification case plan." The court further noted the appellant's positive drug screens

11

and that he had been dismissed from his employment in September 2010 because of a positive drug screen, although, as the court noted, the appellant disputed that he had tested positive for drugs, attributing his dismissal to alcohol instead.

The juvenile court concluded that "no bonds ever existed" between the appellant and his children, and that the appellant had failed to maintain a bond with them in the 12 months prior to the filing of the termination petition. Further, the court found that appellant had failed to support his children as required by law for a period in excess of 12 months, and that he had failed to complete any case plans "as originally prepared by DFCS when the original reunification plans were formulated." The juvenile court also found that the children were currently deprived because none of the parents had suitable housing or employment to care for the children, that appellant was "unstable" and that he and the other father had "untreated" drug issues that would prevent them from being able to parent the children. After making additional findings concerning the children's bonds with the foster parents and the foster parents' willingness to adopt them, the juvenile court concluded that, based on clear and convincing evidence, the appellant's parental rights, as well as the parental rights of the mother and the other father, should be terminated.

1. Appellant first challenges the sufficiency of the evidence to support the juvenile court's order.

On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody has been lost. We proceed in a termination case with the knowledge that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. "(T)he right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances." *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006). *In the Interest of T. E. T.,* 282 Ga. App. 269, 269-270 (638 SE2d 412) (2006); *In the Interest of T. J. J.,* 258 Ga. App. 312, 314 (574 SE2d 387) (2002).

"[T]he juvenile court must find by clear and convincing evidence that there is parental misconduct or inability and that termination is in the best interest of the child. The first requirement is satisfied when the juvenile court finds that (1) the child is deprived, (2) the lack of parental care or control is the cause of the deprivation, (3) such lack of care or control is likely to continue, and (4) the continued deprivation

13

will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child." (Punctuation and footnote citations omitted.) *In the Interest of M. A.,* 280 Ga. App. at 856. Further, OCGA § 15-11-94 (b) (4) (B) sets forth several conditions that a juvenile court may consider in determining whether the child is without proper parental care and control. And since the children were not in the appellant's custody, pursuant to OCGA § 15-11-94 (b) (4) (C)

> the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental right: (i) To develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) To provide for the care and support of the child as required by law or judicial decree; and (iii) To comply with a court ordered plan designed to reunite the child with the parent or parents[.]

(Indentions omitted.).

Without belaboring the point here, we will assume that the evidence was sufficient to show that the children were deprived and that the mother and both fathers were responsible for that deprivation at the time the children were placed in the custody of DFCS. However, we do not believe that the evidence clearly and convincingly showed that, as to the appellant, the deprivation was likely to continue.

14

Although it is well settled that a juvenile court may consider the past conduct of the parent in determining whether the conditions of deprivation are likely to continue, "it is equally true that evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in [his] natural child; clear and convincing evidence of *present* unfitness is required. Moreover, the record must . . . contain clear and convincing evidence that the cause of deprivation is likely to continue." *In the Interest of D. L. T. C.*, 299 Ga. App. 765, 769 (1) (684 SE2d 29) (2009).

> A finding of unfitness must center on the parent alone, that is, can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from the parent. A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere.

Id.

In our view, even construing the evidence in the light most favorable to the judgment below, the juvenile court's order made several pertinent findings that were either contrary to the evidence or not clearly and convincingly shown. First, we are simply hard pressed to discern how the juvenile court concluded that the father had

15

failed to maintain a bond with his children when every witness who testified concerning the appellant's relationship with his children showed that he had maintained regular, scheduled visitation with his children, and that except for some indication he needed to be more of a father figure to his children instead of a friend, that all his interactions with his children were positive and appropriate. Thus, the juvenile court erred by concluding that the father had failed to maintain a bond with his children.

Further, while it is true, as the juvenile court found, that none of the parents completed the requirements of their case plan prior to the time that the decision was made to seek termination of their parental rights, it is also true that the evidence showed that at the time that decision was made the appellant was making progress on his case plan. Indeed it appears to us that efforts to reunify appellant with his children would have continued if not for the *mother's* activities which caused DFCS to decide to discontinue its efforts to return the children to her. And even after DFCS made that decision, and thus was no longer required to offer any of the parents any assistance to continue their progress on their case plans, appellant, *on his own,* completed many of the requirements in his reunification plan including completing parenting and anger management classes, and the requirement that required him to address his

substance abuse issues. And although the juvenile court found that appellant had "untreated drug issues" the uncontradicted evidence showed that the appellant had attended both NA meetings and AA meetings for many months, and had been drug free since he finished that program. Yet, the juvenile court seemed to entirely discount the appellant's significant progress in reaching the goals of his case plan simply because he had not provided the appropriate documentation to DFCS. Although full compliance with a reunification plan is obviously important, we simply do not believe that a parent's rights should be lost simply because of a failure to meet what we view as a "procedural requirement" when in fact a parent has completed much of the substance of the plan.

Also, contrary to the juvenile court's finding that none of the parents had employment or suitable housing, the undisputed evidence showed that the appellant had maintained suitable employment for a long period of time, and there was nothing to show that appellant's current housing was unsuitable. And in fact there was nothing to show that there was anything wrong with appellant's previous living arrangement with his mother, and the DFCS caseworker admitted as much in her testimony. And it is clear that, even when the reunification plan was still in place, DFCS never considered whether a suitable placement for the children might be to

17

place the children with the appellant in his mother's home, and the DFCS caseworker's testimony indicated that she knew of nothing that would be wrong with that placement.

Although the evidence did support the juvenile court's finding that the appellant failed to support his children for a significant part of the time they had been in DFCS's custody, appellant had made recent significant efforts to meet his support obligations and catch up on the arrears. Further, in light of the appellant's other significant progress and the numerous findings of the juvenile court that were not supported clearly and convincingly by the evidence, we do not believe that this failure is sufficient to support the finding that the deprivation was likely to continue, especially in light of the appellant's explanation that he had been unable to meet his support obligations because of the classes he had been attending to meet his case plan. See *In the Interest of A. A.,*, 252 Ga. App. 167, 173 (2) (c) (555 SE2d 827) (2001) (delayed compliance with goal of case plan, standing alone, not always sufficient to support termination).

In sum, although the evidence here does not demonstrate that the appellant acted at all times in an exemplary manner, we cannot say that this is a case where the "evidence" consisted of merely "positive promises" by a parent that he or she would

change and rectify past failures to meet case plan goals or support their child. Further, the appellant's efforts to create and maintain a bond with his children was consistent throughout, and the worst that was said about those visits was that he needed to be more firm in his discipline.

> As we have stated, termination of parental rights is a remedy of last resort and can be sustained only when there is clear and convincing evidence that the cause of the deprivation is likely to continue. In the instant case, (t)he evidence is not clear and convincing, at least at this time, that the deprivation is likely to continue. While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic that the permanent severing of the parent-child relationship. Accordingly, we reverse the judgment and remand the case for establishment of [a] reunification plan[] for [the appellant], subject to whatever disposition is warranted by future events and those occurring since the last termination hearing.

(Punctuation and footnote citation omitted.) *In the Interest of D. L. T. C.*, 299 Ga. App. at 771 (1).[3] *In the Interest of M. A.*, 280 Ga. App. at 857 (1); *In the Interest of S. M. W.*, 287 Ga. App. 288, 290 (1) (651 SE2d 211) (2007); *In the Interest of B. N.*

---

[3] In so holding we wish to make clear that there is little question that both the Department and the juvenile court were attempting to act in the best interests of the children by keeping them with the foster family, and we note the difficulty in deciding cases of this type at both the lower court and appellate levels. *In the Interest of T. E. T.*, 282 Ga. App. at 275-276.

*A.,* 248 Ga. App. 406, 407 (1) (546 SE2d 819) (2001). Compare *In the Interest of J.E.*, 309 Ga. App. 51, 56-57 (1) (c) (711 SE2d 5) (2011) (deprivation likely to continue when mother never paid child support, never had stable housing or employment and used a gram of cocaine every day in the months preceding the hearing); *In the Interest of J. J. J.*, 289 Ga. App. 466, 469-470 (657 SE2d 588) (2008) (deprivation likely to continue when appellant had medically verifiable deficiency of mental or emotional health, failed to support the child, comply with reunification plan and failed to establish bond).

Because we have found the evidence does not support a determination that the deprivation is likely to continue, we need not consider whether the children were being harmed by the deprivation and do not reach the second stage of the inquiry concerning the best interests of the children.

2. Appellant also argues that the juvenile court failed to give proper consideration to relative placements, in particular Patricia and Phillip Smith. Although "[w]e cannot substitute our judgment for a juvenile court's judgment that relative placement was not in the best interest of a child," *In the Interest of S. R. C. J.*, ___ Ga. App. ___ (slip op at (3) & (3) (b)) (Case No. A12A1631, decided September 27, 2012), in light of our reversal of the termination of the appellant's parental rights,

20

it would seem appropriate for the juvenile court to now reconsider its finding that the appellant's relatives, particularly the Smiths, were not suitable placements.[4]

*Judgment reversed. Barnes, P. J., and McFadden, J., concur.*

---

[4] We note the evidence showed that the Smiths were willing to take all three children, not just the two children fathered by appellant, a factor that is critical here since the evidence demonstrated that the three children should not be separated if possible.