642 S.E.2d 148 (2007)
In the Interest of A.F. et al., children (Two Cases).
Nos. A06A1980, A06A1981.
Court of Appeals of Georgia.
February 8, 2007.
*149 Cassandra M. Ford, for appellant (case no. A06A1980).
Carl S. Cansino, Milledgeville, for appellant (case no. A06A1981).
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Mark J. Cicero, Assistant Attorney General, Thomas J. O'Donnell, Milledgeville, for appellee.
JOHNSON, Presiding Judge.
In Case No. A06A1981, the mother of three-year-old A.F., Jr., nine-year-old A.F., and eleven-year-old T.B. appeals from the juvenile court's order terminating her parental rights. She contends that the trial court erred because there was no clear and convincing evidence that she was the cause of her children's deprivation, that any deprivation was likely to continue, and that the deprivation was likely to cause serious mental, emotional or moral harm to the children.
In Case No. A06A1980, the father of three-year-old A.F., Jr., and nine-year-old A.F. appeals from the same order terminating his parental rights.[1] He contends that the trial court erred because there was no clear and convincing evidence that: (1) his children's deprivation was likely to continue, and (2) termination of his parental rights was in the best interests of his children.
We have consolidated the cases for the purposes of appeal and find merit in the parents' claims that there was no clear and convincing evidence that the deprivation is likely to continue. As a result, we must reverse.
The decision to terminate parental rights involves a two-part process. First, the juvenile court must determine whether there is clear and convincing evidence of parental misconduct or inability. This determination is based on a finding that the child is deprived, the lack of proper parental care or control by the parent is the cause of the child being deprived, the cause of the deprivation is likely to continue or will not likely be remedied, and the continued deprivation will cause or is likely to cause serious harm to the child.[2] Second, if the juvenile court finds clear and convincing evidence of parental misconduct or inability, the court considers whether termination of parental rights is in the best interest of the child.[3]
On appeal, we determine whether, viewing the evidence in the light most favorable to the lower court's judgment, any rational trier of fact could have found by clear and convincing evidence that the natural parents' *150 rights to custody have been lost.[4] This standard of review safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a fact-finder might base his or her determination on a few isolated instances of unusual conduct or idiosyncratic behavior.[5] Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.[6]
Viewed in a light most favorable to the judgment of the juvenile court, the evidence shows that A.F. and T.B. came into the custody of the Wilkinson County Department of Family and Children Services on June 12, 2002, when they were five and six years old, respectively, based on the mother's excessive spanking of T.B. with an extension cord.[7] The father was not home during the spanking and discovered that the children were being removed from the home when he arrived home from work. The mother was arrested for cruelty to children, and at the time the juvenile court entered its order terminating the mother's parental rights, the criminal charges against her had not yet been resolved. The parties are not married.
On July 17, 2002, the juvenile court found that the two children were deprived as a result of the mother's physical abuse of T.B. during a spanking. Based on the consent of both parents and DFACS, the juvenile court awarded temporary custody of the children to their aunt and uncle, who resided in North Carolina, for a period of two years. The trial court's order is silent with regard to the payment of child support. Since the children were no longer in DFACS's custody, DFACS did not prepare a case plan for the parents to regain custody of their children.
On April 1, 2003, the father was arrested for selling cocaine. He claimed that he "got in trouble" because he did not have a job at the time and was trying to support his children. In May 2004, a jury found the father guilty and he was sentenced to serve ten years in prison, with five years probated. On January 4, 2005, the father was released from prison early. As a result of his conviction, the father lost his driver's license.
On July 20, 2003, the mother gave birth to a son, A.F., Jr. A.F., Jr., was removed from the mother's care on August 11, 2003, because the criminal charges resulting from her excessive spanking of T.B. in 2002 had not yet been resolved. At the time A.F., Jr., was removed from her custody, the mother was incarcerated on a marijuana charge and a charge of giving an inmate cigarettes.
On September 9, 2003, DFACS developed its first reunification case plan for the appellants, with regard to A.F., Jr., only. The case plan required both parents to obtain and maintain a source of income and safe housing, attend parenting classes, submit to a psychological evaluation, and follow any recommendations for medication or therapy made by the psychologist. The plan also required the father to contact the child support enforcement office to begin paying $160 per month in child support for A.F., Jr. The plan provided for weekly visits of one hour between the parents and A.F., Jr. The case plan notes that the mother's visit with the child was "appropriate" and that the father's visit with the child was "very appropriate."
On December 3, 2003, the mother was evaluated by a psychologist. The psychologist's report summarizes the mother's version of the spanking incident involving T.B. as follows:
her son, six years old, had teeth coming in. Other children told him that if he eats an apple, it will make his teeth come out. The child subsequently made a mess on his clothes while eating an apple. [The mother] says that she whipped him and left a scar on his back. She explains that she had bought special clothes for a special program at school and he messed up the *151 clothes. She elaborates spontaneously, "I've learned not to hit, let it be."
According to the mother, she cut a switch from a bush outside and hit him with it, causing a scar. She explained, "I'm from Mississippi" and was raised that way. The mother also stated while crying, "If they want to send me to jail, I'll do it, I did whip him."
The personality tests taken by the mother revealed that she was depressed, anxious and distraught and the psychologist could not determine if this emotional state was the trigger for the whipping or the result of the children's removal from her home. The psychologist noted that, "She is taking the blame. She is receptive to education and shows some insight surrounding the spanking/whipping." The psychologist recommended that she attend anger management classes and obtain counseling for one year. He opined that "she has a lot of potential in terms of her future well-being."
On January 22, 2004, a psychologist evaluated the father and found no evidence of psychopathology. The father reported that his understanding of the incident with T.B. was that the mother whipped the child in the bathroom. While jumping around during the whipping, T.B. hit the sink, which left a mark.
When the two-year temporary custody period ended for the two older children in July 2004, the father was serving his prison sentence and the aunt and uncle returned them to the custody of DFACS. The trial court awarded temporary custody to DFACS and noted in its order that "[t]he mother now wishes to work a case plan to regain custody of her children." The trial court did not order either of the parents to pay child support.
On August 5, 2004, DFACS prepared its first reunification case plan for the parents to be reunited with A.F. and the mother to be reunited with T.B. These case plans contained the same goals as the case plan created for A.F., Jr. and required the father to pay $160 per month in child support total for A.F. and A.F., Jr. In a case plan review dated November 12, 2004, the caseworker noted that the child support recovery office would not accept the father's child support payments without a court order.
In November 2004, the mother gave birth to another child, T.F., who was diagnosed with cerebral palsy. In order to avoid DFACS taking custody of this child, the mother consented to the maternal grandmother becoming T.F.'s guardian. The child's condition was terminal and he died on February 26, 2006.
Five months after creating its first reunification plan for the two older children, on January 25, 2005, DFACS petitioned the court to terminate the parents' rights with regard to all three children. The case plan for A.F., Jr. had been in effect for 16 months at the time the petition for termination was filed. A caseworker testified that DFACS is required "to file a termination petition after the children have been in care for fifteen out of the last twenty-two months."
The trial court held an initial hearing on the petition to terminate on May 6, 2005. At the conclusion of the hearing, the trial court noted that "there is some evidence that would support termination. But I'm not sure I can make a finding that it would be in the best interest of the children at this time." The trial court found it compelling that "the parents have maintained a relationship to the point where I feel like it's worth giving them a try." As a result, the juvenile court continued the hearing for six months "to allow the mother to demonstrate stability in both her job and her residence as well as completing the remaining requirements of her case plan." The juvenile court also ordered the father to pay $160 per month in child support.
On February 2, 2006, the juvenile court held its final hearing on the petition to terminate and granted it. A summary of evidence presented to the juvenile court over the course of several hearings and before it issued its termination order follows.
With regard to the father's compliance with the case plan, the record shows that he completed everything required of him except with regard to child support. After being released from prison in January 2005, the father returned to construction work, bought *152 and renovated a trailer home in which his family could live, completed parenting classes, and provided health insurance for his children. Although the father did not attend all scheduled visits with his children, he and his caseworker explained that he only missed visits when he had to work or was incarcerated. He attended 80 percent of his scheduled visits and they went "very well." The caseworker explained that the children "were happy to see [their father]. They played. He was very attentive to the children. It was just a good visit all around."
With regard to child support, the record shows that the father was in arrears in the amount of $737. He testified that when he first tried to make his child support payments, they were not accepted. By the time they were accepted, he was already in arrears. He acknowledged that it was important to pay his child support, but explained that if he had chosen to pay all of his child support arrears instead of his power bill "that would have been just another thing in my case plan that I haven't done."
The father testified that he was tested for drug use once a month as a condition of his parole and signed a release allowing DFACS to obtain a copy of the results of his drug screening. Although no evidence was submitted showing a positive drug screen, the father admitted that he tested positive for marijuana in October or November 2005. He explained that he used it during a period in time when his youngest son had been hospitalized and his prognosis was uncertain. He had a "heart to heart" talk with his probation officer and testified that he did not use it again.
With regard to the mother's compliance with the case plan, the record shows that she completed parenting classes in April 2005. She visited consistently, but did miss some scheduled visitations during the end of her pregnancy with T.F., due to transportation issues, and toward the end of T.F.'s life when she spent a lot of time in the city where he lived. The mother does not have a driver's license.
According to DFACS employees who supervised visits, the mother "did extremely well" and "was wonderful with the children" during visits. During one visit in July 2005, however, the mother fell asleep on the couch with A.F., Jr., while the other children were playing outside unsupervised. According to the mother, the children know who she is and ask when they will be able to come home.
A.F., Jr.'s foster mother described the mother as "very loving" during her visits and acknowledged that the mother always brought toys or clothes for her son. During the first hearing on the petition to terminate, the foster mother, who had already testified that she wanted to adopt the child, told the court "I know that both the parents love their child and I can say if it's any way to give them a chance, give them a chance." In the final termination hearing, the foster mother acknowledged that she did not have any concerns about whether the parents would be able to care for A.F., Jr., if he was returned to their home. In her view, A.F., Jr., needed closure, whether that meant that he was returned to his parents or adopted by her.
With regard to employment, the record shows that the mother did not maintain a steady job. She did, however, seek and obtain three different jobs. She left her first employment with a nursing home to take a job with a veterinary clinic. When the clinic closed, she lost her job and started working for the nursing home again. She later lost this job because of down-sizing. The mother continued to look for work in the small town in which she lived without success. Shortly before the final termination hearing, she obtained a job in another city so that she could be close to her terminally ill child.
With regard to housing, the record shows that the mother did not maintain a stable residence. She separated from the father in August 2003 and did not have a home of her own. Instead, she stayed with different friends or relatives for short periods of time. At some point before the father's incarceration in April 2004, the parties lived together again. When he went to jail, she could not support herself and started staying with different people again. The day before the first termination hearing held on May 6, 2005, the mother moved back in with the father and *153 testified that this was her residence through the final termination hearing held on February 3, 2006. However, the record also shows that she spent the majority of December 2005 and January 2006 at her mother's home in another city so that she could be close to her terminally ill child. The mother testified "that's why I go back and forth so often because you just never know."
By the end of 2005, the mother's child support arrears totaled $3,665. In the last six months of 2005, she made two child support payments totaling $160. The mother testified that she could not pay the child support because she did not have the money.
With regard to the mother's drug use, the record shows that DFACS requested that she provide monthly urine samples. She tested positive for marijuana in May 2005 and phenobarbital in July 2005. In October 2005, the mother refused to give a sample because she knew she would test positive for hydrocodene after receiving medication from a dentist. The mother explained that she believed she tested positive for phenobarbital because she gave oral medication to her terminally ill child and might have absorbed some of the drug through her skin. The next four tests revealed no drug use. The mother provided a hair follicle for testing on January 31, 2006, but the results were either not available or not presented at the last hearing held on February 3, 2006.
At the last termination hearing, the guardian ad litem for the children recommended that the parties' parental rights be terminated, stating:
I'm not saying they're bad people. If we can just wait or give them another year, another two years and maybe they can get it together. But, unfortunately, that's just not the case. . . . I think that terminating their parental rights is just something we're going to have to do. They've had plenty of time and they have not been able to get it together. They're just not strong enough to do what they have to do to provide a stable home.
The trial court followed the guardian ad litem's recommendation and terminated the mother's and father's parental rights. The determining factors for the trial court were the parties' continued use of marijuana,[8] the additional time they had already been given to complete their case plans, the "rickety state" of the family that precluded reunification, and the harm caused by the lack of permanency for the children. Finally, the trial court noted that it "hate[d] to do it in this case, because the parents have a bond with these children."
The parties filed a motion for reconsideration and the trial court held a hearing on May 5, 2006. At the conclusion of the hearing, the trial court stated,
Let me say this. And I think in looking at my ruling, the transcript of my ruling, it's clear that I was ambivalent even in February. But I think something that the foster mother said was really compelling, and that is, these children need closure on this. This is not just about the parents. It's also about these children. What I'm going to do is to take this under advisement. I'm going to go back and look at every single word, every bit of  every scrap of evidence, and reevaluate. And then I'll issue a ruling.
On May 17, 2006, the trial court denied the motion for reconsideration in a one-sentence order.
After carefully considering the record before us, we find it fails to present clear and convincing evidence that the children's deprivation is likely to continue. Both parents made significant progress on their case plans, and their inability to dot every "i" and cross every "t" cannot be placed entirely on their own shoulders. Additionally, a failure by parents "to live up to societal norms for productivity, morality, cleanliness and responsibility does not summarily rob [them] of the right to raise [their] own offspring, nor does it end the child[rens'] right to be raised by [their own parents]."[9]
There can scarcely be imagined a more fundamental and fiercely guarded right *154 than the right of a natural parent to its offspring. To terminate that right is to sever that right for the future as effectively in law as if it never existed. It is a tearing of the flesh and it can be done by the court only under the most carefully controlled and regulated circumstances for the sake of the child. There must be compelling facts to establish the necessary lack of proper parental care or control justifying the government's intrusion in cutting natural family ties.[10]
In this case, there is not clear and convincing evidence of present parental unfitness and it is clear that the children are emotionally attached to the parents. As result, we must reverse the judgment of the juvenile court.[11] We note, however, that we do not know what has transpired in the parents' lives since the last hearing in May 2006. On remand, the juvenile court will be able to consider that information when it reevaluates the case.[12]
In light of the parents' recent progress, we remand these cases to the juvenile court for the establishment of a reunification plan, subject to the juvenile court's judgment as to whether reunification remains warranted by events occurring since the last termination hearing.[13]
Judgments reversed.
MILLER and ELLINGTON, JJ., concur.
NOTES
[1] The juvenile court terminated the parental rights of T.B.'s father in a separate order several months earlier, and the termination of his rights are not at issue in this appeal.
[2] In the Interest of K.W., 233 Ga.App. 140, 141(2), 503 S.E.2d 394 (1998).
[3] Id.
[4] In the Interest of R.N., 224 Ga.App. 202, 480 S.E.2d 243 (1997).
[5] In the Interest of J.W., 271 Ga.App. 518, 518-519, 610 S.E.2d 144 (2005).
[6] Id.
[7] The mother admitted that in 2001 she was also investigated for allegedly abusing T.B. while residing in North Carolina. According to the mother, the caseworker closed the case because it was groundless. The record contains no other evidence with regard to this incident.
[8] The trial court declined to find that the mother had used phenobarbital.
[9] R.C.N. v. State of Georgia, 141 Ga.App. 490, 491, 233 S.E.2d 866 (1977).
[10] (Citation and punctuation omitted.) Id. at 491-492, 233 S.E.2d 866.
[11] See In the Interest of K.M., 240 Ga.App. 677, 680, 523 S.E.2d 640 (1999); Harper v. Dept. of Human Resources, 159 Ga.App. 758, 760(3), 285 S.E.2d 220 (1981) (physical precedent only).
[12] See In the Interest of K.M., 240 Ga.App. at 680, n. 2, 523 S.E.2d 640.
[13] See In the Interest of D.C.N.K., 232 Ga.App. 85, 90, 501 S.E.2d 268 (1998).