**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**October 4, 2013**

# In the Court of Appeals of Georgia

A13A0920. IN THE INTEREST OF C. G. et al., children.

MCMILLIAN, Judge.

The mother of C. G. and C. G. appeals the juvenile court's termination of her parental rights.

"On appeal from a juvenile court's decision to terminate parental rights, we review the evidence in the light most favorable to the court's decision and determine whether any rational trier of fact could have found by clear and convincing evidence that the parental rights should be terminated." (Citation and punctuation omitted.) *In the Interest of E. S. K.*, 299 Ga. App. 35, 35-36 (681 SE2d 705) (2009).

The Department of Family and Children Services (DFACS) first took C. G. and C. G. into custody on April 29, 2011 when the mother was arrested and jailed on a charge of possession of methamphetamine, leaving the children without a custodian.

The juvenile court's initial detention order directed the mother to comply with drug screens as requested by DFACS. On July 7, 2011, the juvenile court issued an order finding that the children were deprived, citing the hearing testimony of an investigator for the Rockdale County Sheriff's Department, as well as the mother's testimony. According to the deprivation order, the investigator testified that during the execution of a search warrant on the mother's residence, police discovered methamphetamine, marijuana, and drug-related items, including a pipe. The methamphetamine was found in a hat on a bed in the mother's bedroom, within the children's easy access. The mother told police that the children slept in the room. The mother initially admitted that the drugs were hers, but later denied it.

The deprivation order also indicates that the mother chose to testify at the deprivation hearing after being advised of her Fifth Amendment Rights, and she admitted that she had used methamphetamine two weeks before being admitted to a hospital for a stillbirth, which was shortly before the execution of the search warrant. The mother admitted that she needed to "'get herself together'" before getting her children back. She said that she had a difficult time staying away from drugs while she lived with her mother, who uses drugs. She acknowledged that her participation in a substance abuse program would play a large role in any determination as to

2

whether her children would be returned to her. The deprivation order directed that DFACS discuss with the mother her options for substance abuse treatment.

A final disposition hearing was held on September 7, 2011, and in the juvenile court's order dated September 12, 2011, the court found that the mother had done nothing to address her substance abuse since the children had been removed from her custody. The order reflects, however, that the mother may have, at least, moved from her mother's house to avoid the easy access illegal drugs she had previously described. The case manager said that she had discussed with the mother the need to obtain treatment for her substance abuse. On August 26, 2011, the mother met with the case worker to discuss her case plan, and at that time tested positive for illegal drugs; however, the mother denied any drug use. She told the case manager that she was moving back into her mother's home because her father asked her to "'cop some dope.'" Although the case manager scheduled a meeting for August 29 to discuss the mother's options for treatment and to go over an amended case plan, the mother failed to appear for the meeting. On September 12, 2011, the trial court ordered, nunc pro tunc to September 7, that the mother had until September 21 to seek rehabilitation services or her reunification services would be terminated.

The mother apparently failed to seek substance abuse treatment, and on October 24, 2011, DFACS filed a motion to end the reunification plan. On December 5, 2011, following a hearing, the juvenile court granted that motion, ending DFACS's reunification efforts. In that order, the juvenile court found that the mother had "consistently" tested positive for the presence of illegal drugs and had missed two appointments to discuss her entry into a substance abuse program since September 7, 2011. The order indicates that the mother met with the case manager on November 23, 2011, and reported that she was six months pregnant. The mother said that she did not need to be in inpatient treatment, but neither had she made any effort to seek outpatient treatment.

On December 23, 2011, the mother was re-incarcerated on the April drug charges. And on February 6, 2012, she pled guilty and was sentenced as a first offender to five years with two years to serve, which would be suspended upon her successful completion of a rehabilitation program and aftercare.

In the interim, DFACS prepared new, non-reunification case plans for the two children , and on April 23, 2012, DFACS filed a petition to terminate the mother's parental rights.

At the subsequent termination hearing on August 29, 2012, one of the children's former DFACS caseworkers[1] testified that although the Department had provided the mother the necessary referrals, she had not started any rehabilitation program before her second incarceration in December 2011. She lacked stable housing and employment because she was incarcerated, but DFACS had received information indicating that the mother's grandmother had offered the mother a place to live after she completed her sentence. The case manager had not contacted the grandmother, nor has she contacted the mother since her re-incarceration in December 2011. Thus, she had no knowledge of her financial circumstances. The case manager indicated that the children had been placed with friends of the family, and their home was being evaluated as a potential adoptive home.

The mother testified that she was on the waiting list to enter the Residential Substance-Abuse Treatment (RSAT) program sponsored by the Department of Corrections. A probation officer assigned to the mother's case described the RSAT program as an intensive six-month inpatient substance-abuse treatment program. The

---

[1] The current case manager did not testify, although she was present and presumably available to do so.

mother cannot have the children with her during this program because it is part of the prison system.

The probation officer further testified that following the mother's successful completion of the program, she would be expected to participate in six months of probationary aftercare. During the first phase of aftercare, she would be required to meet with her probation officer every week, to submit to weekly drug tests and to attend at least two Narcotics Anonymous (NA) meetings every week. The mother would also see a counselor every other week, who would evaluate her and determine whether further treatment is indicated. During the second phase, her probation meetings and drug tests would scale back to every other week, but she would be required to attend three NA meetings per week instead of two. The program also includes field visits to the mother's home every month. The caseworker indicated that DFACS would be satisfied with the treatment the mother would receive in the RSAT program and would consider her successful completion of the program as meeting the requirements of her case plan.

The probation officer indicated that the waiting list for this program was six months. At the time of the hearing, the mother had been on the list for five months, and she was slated to be the county's next female prisoner to enter the program. He

6

estimated that the program had an 80 percent success rate, which he defined as not relapsing during or after completing the program and aftercare.

The mother stated that after completing the RSAT program, she intends to find a source for outside treatment and to live with her paternal grandparents in their home. She had identified two potential substance abuse programs that she believed to be state-funded. She said that she had not had any involvement with illegal drugs since her December 2011 incarceration.

Moreover, during her incarceration, she attended weekly Alcoholics Anonymous (AA) and NA meetings (the only such meetings available to her), earned "trusty" status enabling her to work in the jail's laundry, and took classes toward completing her GED as well as other offered courses, including one that taught job search skills. Although her last contact with the children was on April 29, 2011, she said that she was told she could not have contact with them.

The mother's paternal grandmother testified that she had a room in her house prepared for the mother to live when she completed the RSAT program. The mother's grandfather and uncle also reside in the house. The grandmother said that she will expect the mother to attend church with them, to get a job and to keep her room clean. She also has insisted that the mother have nothing to do with her old community or

old friends. She would also welcome the children for visits in her home. She has been in contact with the mother and believes she has changed. She has also seen the children at church and said that they seem fine.

The statutory framework for the termination of parental rights sets out a two-pronged test:

> In the first prong, the court must decide whether there is present clear and convincing evidence of parental misconduct or inability. OCGA § 15-11-94 (a). Parental misconduct or inability, in turn, is proven by evidence showing: (1) that the child is deprived; (2) that lack of proper parental care or control is the cause of deprivation; (3) that the cause of deprivation is likely to continue or will not likely be remedied; and (4) that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94 (b) (4) (A). In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child.

(Citation omitted.) *In the Interest of R. N. H.*, 286 Ga. App. 737, 739-740 (650 SE2d 397) (2007). In determining whether a child is without proper parental care or control when the child is not in the parent's custody, the court may consider

> whether the parent without justifiable cause has failed significantly *for a period of one year or longer prior to the filing of the petition for termination of parental rights*: (i) [t]o develop and maintain a parental

bond with the child in a meaningful, supportive manner; (ii) [t]o provide for the care and support of the child as required by law or judicial decree; and (iii) [t]o comply with a court ordered plan designed to reunite the child with the parent or parents[.]

(Emphasis supplied.) OCGA § 15–11–94 (b) (4) (C).

Here, the juvenile court found that the children were deprived in light of the mother's incarceration, unrehabilitated substance abuse, and lack of stable housing and income. Because she was still incarcerated and had not yet begun the rehabilitation program, the court found that this deprivation was likely to continue, and will cause serious harm to the children due to their lack of a bond with her and need for permanency. On this point, the court noted that the children have not seen their mother since April 2011.

The juvenile court then found that termination of the mother's parental rights was proper under OCGA § 15-11-94 (b) (4) (B) (ii) in that "she has an excessive use of or history of chronic unrehabilitated abuse of intoxicating liquors or narcotics with the effect of rendering her incapable of providing adequately for the children's physical, mental and emotional needs and moral condition;" under OCGA § 15-11-94 (b) (4) (C) (i) in that she failed to maintain a bond with her children; under OCGA § 15-11-94 (b) (4) (C) (ii) in that she failed to provide for the care and support of the

9

children as required by law or judicial decree; and under OCGA § 15-11-94 (b) (4) (C) (iii) in that she had failed to comply with the court-ordered case plans designed to reunite her with her children. With regard to latter ground, the court found that the mother had not maintained stable housing or employment, had not successfully completed a substance abuse treatment program and had not maintained meaningful contact with the children.

The juvenile court also noted that the children were currently placed with friends of the family, and were bonded to that family and doing well. Ultimately, the court determined that termination of the mother's parental rights would be in the children's best interest.

It is well settled that "[c]ompelling facts are required to terminate parental rights." (Citations omitted.) *In Interest of H. L. T.*, 164 Ga. App. 517, 519 (298 SE2d 33) (1982). Further,

> [w]e proceed in a termination case with the knowledge that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.

(Citations and punctuation omitted.) *In the Interest of C. S.*, 319 Ga. App. 138, 144-145 (1) (735 SE2d 140) (2012). See also *In the Interest of T. E. T.*, 282 Ga. App. 269, 269–270 (638 SE2d 412) (2006); *In the Interest of T. J. J.*, 258 Ga. App. 312, 314 (574 SE2d 387) (2002).

We find that the juvenile court's findings regarding the mother's parental misconduct or inability are not supported by clear and convincing evidence. As an initial matter, we note that DFACS filed the petition for termination of the mother's parental rights on April 23, 2012, less than one year after the children were taken from the mother's custody on April 29, 2011. Accordingly, the evidence does not support the trial court's findings that the mother failed to maintain a bond with her children, failed to provide support and failed to comply with the DFACS case plans for the requisite statutory period of "one year or longer prior to the filing of the petition for termination of parental rights." OCGA § 15-11-94 (b) (4) (C). In fact, the record does not contain a copy of any case plan other than the non-reunification case plans developed in January 2012, three months before the termination petition was filed and after the mother was re-incarcerated.

11

Moreover, the record contains insufficient evidence to support the juvenile court's findings with regard to excessive or chronic unrehabilitated drug use.[2] Although the juvenile court's December 5, 2011 order found that the mother "consistently" tested positive for the presence of illegal drugs, the record contains only one reference, in a prior order, to a failed drug test, on August 26, 2011. An earlier order indicated that the mother admitted that she had used illegal drugs a few weeks before the police executed the search warrant on her mother's house in April 2011. But the record contains no evidence, from the termination hearing or otherwise, with regard to these two instances.

Other than evidence of her guilty plea to the April 2011 drug charge , the only evidence at the termination hearing relating to the mother's prior use of illegal drugs came in response to the juvenile court's question regarding a 2003 proceeding involving a third child. The court asked the mother whether allegations in the 2003 petition that the mother used drugs at that time were true, and she replied, "I think so." When the juvenile court asked the mother's grandmother the same question, she stated that she did not know and that she had never seen the mother use drugs. And

_____

[2] We note that the record contains *no* evidence of any use of intoxicating liquors by the mother.

12

we note that the mother's February 2012 conviction was treated as a first offense. Additionally, the mother stated that she was attending weekly AA and NA meetings, steps toward addressing her use of illegal drugs. She stated that she had not used illegal drugs since her re-incarceration in December 2011, and DFACS presented no evidence to counter this testimony.

Even if we consider the juvenile court's recitation of evidence regarding the prior two instances of drug use along with the evidence presented at the hearing, we find that the record falls short of providing clear and convincing evidence to support a finding of excessive or chronic unrehabilitated drug abuse.

Additionally, we find that the record lacks clear and convincing evidence to support the juvenile court's finding that the cause of the children's deprivation was likely to continue. Because the record does not contain any reunification case plan, we have no evidence of the case plan goals other than the requirement that she seek treatment for substance abuse. But it is unclear whether or when the mother may have been directed to seek such services prior to the juvenile court's September 12, 2011 order, which gave her less than two weeks to do so. A little over one month later, on October 24, DFACS filed a motion to pursue a non-reunification plan. Therefore, DFACS gave this mother less than four months from the time her children were taken

into its custody before beginning the process of making her loss of custody permanent and less than one year before seeking to terminate her parental rights.

Although the mother failed to seek treatment before she was incarcerated, while in jail, she took advantage of the only substance abuse treatment programs available to her. She also worked toward her GED and held a "trusty" position in the prison laundry. Moreover, shortly after the termination hearing, she was to begin intensive treatment in a program with a high rate of success. After this six-month inpatient program, aftercare was provided to help her achieve her treatment goals. The mother had secured housing following her release from jail, where her children were welcome. She had also participated in a program designed to help her obtain employment after she was released. And although the mother had not had contact with her children in over a year, she said she was told she could not contact them. DFACS presented no evidence to contradict this testimony. Even though the mother was slow to address her issues, by the time of the hearing she had made recognizable progress, was scheduled to begin further intensive treatment a short time later, and had identified concrete steps for the future. Under these circumstances, we find that the juvenile court erred in determining that clear and convincing evidence existed to support a finding that the children's deprivation was likely to continue.

Accordingly, we reverse the trial court's order granting the petition to terminate the mother's parental rights.

*Judgment reversed. Andrews, P. J., and Dillard, J., concur.*