**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 11, 2014**

# In the Court of Appeals of Georgia

A13A2496. IN THE INTEREST OF D. P., a child.　　　　　　　JE-124

ELLINGTON, Presiding Judge.

The mother of four-year-old D. P. appeals from an order of the Juvenile Court of Coweta County that terminated her parental rights.[1] She contends that there was insufficient clear and convincing evidence to support the court's conclusions that termination of her parental rights was authorized by her failure to complete certain requirements while her son was in foster care, that her son's deprivation is likely to continue, and that he will suffer serious harm unless her parental rights are terminated. For the following reasons, we agree with these contentions and, as a result, reverse the juvenile court's termination order.

---

[1] This Court granted the mother's application for discretionary review, Case No. A13D0395. See OCGA § 5-6-35 (a) (12) (2013).

Before terminating a parent's rights, a juvenile court must employ a two-prong test. In the first prong, the court must decide whether there is present clear and convincing evidence of parental misconduct or inability. [Former] OCGA § 15-11-94 (a).[2] Parental misconduct or inability, in turn, is proven by evidence showing: (1) that the child is deprived; (2) that lack of proper parental care or control is the cause of deprivation;[3] (3) that the cause of deprivation is likely to continue or will not likely be remedied; and (4) that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. [Former] OCGA § 15-11-94 (b) (4) (A). In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child[, after considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. [Former] OCGA § 15-11-94 (a).]

(Citation and punctuation omitted.) *In the Interest of C. J. V.*, 323 Ga. App. 283, 283-284 (746 SE2d 783) (2013).

---

[2] In 2013, the General Assembly adopted a new Juvenile Code to replace Chapter 11 of Title 15 of the Georgia Code. Ga. L. 2013, p. 294, § 1-1. The new Juvenile Code became effective on January 1, 2014, and applies to all juvenile proceedings commenced on and after such date. Ga. L. 2013, p. 294, § 5-1.

[3] Subsections (b) (4) (B) and (b) (4) (C) of former OCGA § 15-11-94 set out several factors that a juvenile court may consider in deciding whether the child is without proper parental care and control.

In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated. In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.

(Footnotes omitted.) *In the Interest of T. L.*, 279 Ga. App. 7, 10 (630 SE2d 154) (2006).

Even so, in conducting our review, we must proceed

with the knowledge that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.

(Citations and punctuation omitted.) *In the Interest of C. J. V.*, 323 Ga. App. at 283. In fact, historically, this Court has made it clear "that a parent's rights to his or her child will not be terminated without some required showing of parental unfitness, caused either by intentional or unintentional misconduct resulting in abuse or neglect

3

of the child, or be what is tantamount to physical or mental incapability to care for the child." (Citations and punctuation omitted.) *In the Interest of H. L. T.*, 164 Ga. App. 517, 518 (298 SE2d 33) (1982).

Viewed in favor of the juvenile court's judgment, the record shows the following relevant facts. In December 2010, when D. P. was about 17 months old, his 21-year-old mother contacted the Coweta County office of the Georgia Department of Human Services, Division of Family and Children Services ("the Department") and asked for help because she was unemployed and homeless and had been unable to find a shelter that would accept both her and her son. A Department caseworker arranged for the mother and D. P. to stay in a relative's home, but, five days later, the relative contacted the caseworker and notified her that the arrangement had to end because the child cried too much. Unable to find another relative placement for the mother and child, the Department placed D. P. in foster care. The Department created a reunification plan for the mother that required her to maintain stable employment for at least six months, to maintain safe, clean, and stable housing for at least six months, and to participate in in-home counseling and parenting skills training.

According to the Department's June 2011 report on the mother's progress on her reunification plan, the mother "has been searching for employment and is in

4

school." Similarly, in a November 2011 report, the citizen's review panel noted that the mother "is a full-time student [and] doing very well. She has been diligently looking for a job."

Further, in a November 2011 report, the Coweta County Court Appointed Special Advocate ("CASA") volunteer stated that the mother "is a loving mother who is young (22 years old) and trying to make a success of her life with little family or community support. [The mother] *voluntarily* brought her child into foster care. There was *NO abuse, NO neglect, and NO drug use* that required [the Department] to take this child for protection." (Emphasis in original.) The report also noted that the mother had expressed that "she feels depressed and misses her son," but had not yet received a referral from the Department for in-home counseling. Moreover, according to the CASA volunteer, some of the mother's failure to complete her case plan goals

> can be attributed to her lack of skills to procure a job[,] and[,] without a job[,] she is unable to obtain and maintain safe housing for herself and her child. [The mother] has applied to numerous jobs but has not been offered employment. [The mother] is working to change her life. She is currently a full time student with perfect attendance and an overall [grade point average] of 3.5. [Further, the mother] has maintained communication with her son throughout. She has been *available for*

*every* parent-child visit and has provided food and items to the best of her ability.[4]

(Emphasis in original.)

In fact, it is undisputed that, while working with the Department on her reunification plan, the mother completed a full-time, eight-month program to become a certified medical assistant. She was unable to become certified, however, because she could not pay the separate $400 fee for the certification test[5] or pay for transportation to the testing site.

Despite the mother's documented progress on her reunification plan goals in the eight months after D. P. entered foster care, including her enrollment in the full-time job training program, the Department announced its intention to file a petition to terminate the mother's parental rights in August 2011. However, after the citizen review panel disagreed with the Department's termination recommendation, the juvenile court ordered that it would not consider a termination petition before

_____

[4] The CASA volunteer attached a letter from the mother that, according to the report, "shows her concern and caring for her son's well being now and in the future."

[5] In addition, the mother incurred at least $7,400 in student loans to pay for the medical assisting program.

February 2012, when the panel was scheduled to reevaluate the mother's situation and progress.

In a May 2012 report, the citizen review panel noted that, although the mother had no job or permanent housing, she was still "on track with school," the "visitations and parenting classes [were] both going well," and, in individual therapy, the mother was working on "coping skills" and the sessions were "going well so far." The panel recommended that the Department continue to provide therapy and other reunification services for the mother.

Then, in November 2012, the juvenile court issued an order discontinuing the mother's visitation with D. P. and the Department's reunification efforts. A month later, in December 2012, the CASA volunteer reported that D. P. "speaks often about Momma ____[6] and how he wants to go and see her. There is a strong bond between Mother and child. Therapy may be needed to help [D. P.] adjust to no longer visiting with his mother."

Ultimately, in February 2013, after D. P. had been in foster care for two years, the Department filed a petition to terminate the mother's parental rights. During the April 2013 termination hearing, the Department presented the testimony of two of its

[6] The mother's first name has been omitted for privacy reasons.

caseworkers, a parent aide, and the CASA volunteer. In contrast to the reports cited above, the witnesses testified that, in their opinions, the mother had demonstrated a lack of motivation and had failed to make sufficient progress on most of her case plan goals, despite their efforts to assist her. Specifically, the Department showed that the mother had failed to obtain and maintain a full-time, permanent job, although she had sporadically earned money by babysitting, house cleaning, and hair styling, had worked for a few months in a temporary retail position, and had been a full-time student for eight months. She had also failed to secure adequate housing, despite having been encouraged to apply for public subsidized housing. Instead, the mother had stayed with friends or relatives while D. P. was in foster care.

Further, the witnesses testified that the Department had provided the mother with a counselor to assist her in coping with her depression and stress, dealing with her separation from D. P., and reducing her isolation from family and community resources. A caseworker testified, however, that the Department cancelled the service after several months because the mother had refused to work with the counselor.[7] The

---

[7] According to the mother, the anxiety and depression she was experiencing arose from her financial problems, her inability to find a job or housing, and her separation from her son. She testified that she did not refuse counseling, but had told the counselor that she did not believe the counseling sessions were helping, because they did not address those core issues and, until those problems were resolved, she

Department also provided the mother with a parent aide to supervise her visitations with D. P. and to help her improve her parenting skills. According to the parent aide, the mother sometimes had difficulty controlling D. P.'s behavior during visitations, but otherwise exhibited appropriate parenting techniques.

In addition to this evidence, the Department showed that the mother had been incarcerated twice while D. P. was in foster care. She was incarcerated from August to October 2012 based upon a July 2011 charge for shoplifting at WalMart. She was also incarcerated for a month in early 2013 for failing to pay the Department child support for D. P. while he was in foster care.

1. The mother contends that there was insufficient clear and convincing evidence to support the juvenile court's conclusion that, pursuant to former OCGA § 15-11-94 (b) (4) (C),[8] termination of her parental rights was authorized based upon

would continue to feel stressed and anxious.

[8] Under former OCGA § 15-11-94 (b) (4) (C), in determining whether the child is without proper parental care and control when the child is not in the custody of the parent who is the subject of the proceedings,

> the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i) To develop and maintain a parental bond with the child in a

its findings that she failed to comply with the following requirements for at least one year: (a) complete her reunification case plan goals of obtaining and maintaining employment and housing, (b) maintain a parental bond with her son, and (c) pay child support.

(a) The mother contends that there was insufficient clear and convincing evidence to support a finding that she has, without justifiable cause, failed to complete her plan goal of obtaining stable employment and housing.

As shown above, while it is undisputed that the mother failed to obtain permanent, full-time employment while D. P. was in foster care, it is also undisputed that she applied for numerous jobs without success, worked in at least one temporary job, and earned money cleaning houses and doing other small jobs. In addition, she was eventually hired for a full-time job with a company about ten minutes from her home, to begin three days after the termination hearing. She also testified, without contradiction, that this job would eventually pay enough for her to find stable housing and to support both her and D. P. Significantly, throughout the time D. P. was in

---

meaningful, supportive manner; (ii) To provide for the care and support of the child as required by law or judicial decree; and (iii) To comply with a court ordered plan designed to reunite the child with the parent or parents[.]

10

foster care, the mother had to cope with a major financial recession, as well as her inability to secure stable housing and the lack of reliable transportation.[9] Moreover, it is possible that her efforts to get a full-time job and obtain some financial stability were further hindered by her participation in the eight-month, full-time job training program, as well as her incarceration for two to three months. The trial court's ruling, however, fails to address whether the mother's failure to secure permanent full-time employment was "without justifiable cause," as required by former OCGA § 15-11-94 (b) (4) (C).[10]

The same is true with the issue of the mother's failure to obtain stable housing. It is undisputed that Coweta County's subsidized housing program had a waiting list and that applicants could wait from 18 months to two years for available housing. The mother testified that she had been on that waiting list for at least a year; in addition, she had applied for government housing in two other jurisdictions. She also testified

---

[9] There is no evidence that Coweta County has a public transportation system, and the mother testified that she does not have a driver's license or money to pay for gas or a cab.

[10] See generally *In the Interest of T. Z. L.*, __ Ga. App. __, __ (a) (751 SE2d 854) (2013) (The father's inability to complete reunification plan goals of obtaining employment and housing and completing an assessment for drug abuse was due to his incarceration for a theft conviction and, therefore, did not support termination of his rights under former OCGA § 15-11-94 (b) (4) (C) (iii).).

11

that her lack of stable employment and reliable transportation hindered her ability to obtain stable housing.

Given this evidence,

it appears that this is a case where the primary reason the mother's rights were terminated was due to economic inability to provide for [D. P.], and that her shortcomings in failing to comply with the two major components of her case plan stem largely from her relative poverty. However, it is well established that poverty alone is not a basis for termination. Similarly, we have held that the fact that a mother is unemployed, without prospects for future employment, and without any stable living arrangements is not sufficient to terminate parental rights. Moreover, in this case there is no evidence of a verifiable mental or physical condition that indicates the mother is incapable of caring for [D. P.]. And the juvenile court appears to have totally discounted the fact that[,] despite the hurdles facing the mother in her bleak economic environment, she managed to find a job which [will give] her enough income to pay her rent and [financially support her child]. Accordingly, this is not a case where the "evidence" consisted of merely "positive promises" from the parent that she would change and rectify past failures so as to avoid termination of her parental rights, and the juvenile court appears to have prematurely discounted the mother's progress toward meeting her [reunification plan] goals.

(Citations and punctuation omitted.) *In the Interest of C. J. V.*, 323 Ga. App. at 286-287. See also *In the Interest of K. J.*, 226 Ga. App. 303, 305 (1) (486 SE2d 899)

12

(1997); see generally *In the Interest of E.M.*, 264 Ga. App. 277, 281 (590 SE2d 241) (2003) (This Court reversed the termination of the father's parental rights, ruling that, "[a]lthough the father's inability to secure stable housing and employment regrettably serves neither his nor his child's best interests, it in no way constitutes intentional or unintentional misconduct resulting in abuse or neglect of the child.").

Thus, we conclude that there was insufficient clear and convincing evidence to support a finding that the mother has, without justifiable cause, failed to complete her reunification plan goals of obtaining stable employment and housing. As a result, the court was not authorized to terminate the mother's parental rights on that basis.

(b) We also agree with the mother's contention that there was insufficient clear and convincing evidence to support the trial court's findings that she failed to maintain a close parental bond with D. P. in a meaningful and supportive manner and that, instead, the child's behavior "regressed" during visitations with her.

The hearing transcript shows that one of the Department's caseworkers testified that D. P. "loved his mother," called her "Mama _____," and talked about her, and that there "obviously was a bond" between him and his mother. Further, the parent aide testified that, when she started working with the mother and D. P. in March 2011, they were "very close" and had one of the strongest bonds she had ever

13

observed, so much so that D. P. would kick and scream when he had to leave his mother after visits. After spending several months in foster care, however, D. P. began exhibiting angry and/or aggressive behavior during visits with his mother. The parent aide admitted that D. P. may have behaved like that because he was angry about being separated from his mother, with whom he had a strong bond. Further, it is undisputed that D. P. exhibited similar aggressive behavior when he was at day care, causing him to get "kicked out" of two day care centers.

As to whether D. P.'s behavior "regressed" during visitations, the only evidence on this issue was the opinion testimony of a parent aide and a Department caseworker, neither of whom were experts in child behavior. In fact, the caseworker reached her conclusion about D. P.'s "regression" after observing a single visitation session, during which three-year-old D. P. acted "aggressively" toward his mother, threw things, and engaged in "baby talk." The Department presented no expert witness testimony, however, that the child's behavior was anything other than what would be expected for a very young child during a brief, periodic visit with his mother, with whom he had a strong bond.[11] And, significantly, the evidence did not

_____

[11] In fact, as noted by the CASA volunteer in her November 2011report to the juvenile court, D. P.'s preschool teacher reported that he could be "aggressive in class[,] often hitting, screaming and running around the classroom, though she noted

14

demonstrate a clear causal link between the mother's presence and the child's aggressive behavior, as it is undisputed that D. P. exhibited similar aggressive behavior while attending day care.

Finally, the parent aide testified that the mother generally exhibited appropriate parenting techniques, but she needed to continue to work on her methods of disciplining the child, while the caseworker testified that, in dealing with D. P.'s behavior, the mother tried to implement the techniques she had learned during her parenting sessions.

We find that there was insufficient clear and convincing evidence to support a conclusion that the mother failed, without justifiable cause, to maintain a parental bond with D. P. As a result, the trial court was not authorized to terminate the mother's parental rights on this basis. See *In the Interest of C. S.*, 319 Ga. App. 138, 146 (1) (735 SE2d 140) (2012) (The juvenile court erred in concluding that the father had failed to maintain a bond with his children when every witness who testified concerning the appellant's relationship with his children showed that he had maintained regular, scheduled visitation with his children and that, except for some indication he needed to be more of a father figure to his children instead of a friend,

that *these were typical two year old behaviors*." (Emphasis supplied.)

15

all of his interactions with his children were positive and appropriate.); *In the Interest of M. T. F.*, 318 Ga. App. 135, 146-147 (1) (a) (733 SE2d 432) (2012) (The juvenile court erred in concluding that the mother failed to develop and maintain a parental bond with her child before the filing of the termination petition. Indeed, the evidence showed that the mother had always appeared ready for visitations, she appeared loving and caring toward her child, and he recognized her as his mother.).

(c) We also find that the juvenile court erred to the extent that it concluded that termination of the mother's rights was authorized by her failure to pay child support for D. P., pursuant to former OCGA § 15-11-94 (b) (4) (C) (ii). While the undisputed evidence supports the court's finding that the mother failed to pay child support while D. P. was in foster care, the juvenile court did not address whether that failure was "without justifiable cause," as required by the statute in order to authorize the termination of the mother's rights.

On that issue, the record shows that there was nothing in the numerous reunification plans, progress reports, and court orders that notified the mother of her obligation to pay the Department child support for its care of D. P., let alone any

16

notice of how much she must pay, when, and to whom.[12] In fact, the first time the mother's obligation to pay child support for D. P. was mentioned in a document that was either *signed* by or *served* to the mother was in a September 2012 case plan report. That notice gave general information and did not state the amount the mother was expected to pay or when.[13] And, despite the fact that there was no outstanding warrant for her failure to pay child support as of November 7, 2012, the mother was incarcerated for failure to pay child support about three months later, at which time she was allegedly about $2,000 in arrears. Finally, although the mother's month-long incarceration began on February 14, 2013, the Department did not mention her failure to pay child support or her resulting incarceration as a basis for terminating her parental rights in its termination petition, which it filed the next day.

Accordingly, we conclude that there was insufficient clear and convincing evidence in the record to support a finding that the mother's failure to pay child support was without justifiable cause, as required by former OCGA § 15-11-94 (b)

---

[12] But see *In the Interest of R. W.*, 248 Ga. App. 522, 526 (2) (546 SE2d 882) (2001) ("A parent . . . has a statutory duty to support her children, with or without a court order. OCGA § 19-7-2.").

[13] The report stated as follows: "Please note that [the Department] expects you to pay child support while your child is in state custody. Failure to pay child support is a ground for termination of your parental rights." (Emphasis omitted.)

(4) (C) (ii). It follows that such failure did not authorize the termination of her parental rights.

2. We also agree with the mother's contention that there was insufficient clear and convincing evidence to support the juvenile court's conclusion that D. P.'s deprivation is likely to continue if her rights are not terminated.

"As we have stated, termination of parental rights is a remedy of last resort and can be sustained only when there is clear and convincing evidence that the cause of the deprivation is likely to continue." (Citations and punctuation omitted.) *In the Interest of C. J. V.*, 323 Ga. App. at 287.

> Although it is well settled that a juvenile court may consider the past conduct of the parent in determining whether the conditions of deprivation are likely to continue, it is equally true that evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of *present* unfitness is required.

(Citation and punctuation omitted; emphasis in original.) Id. at 285-286. See also *In the Interest of K. J.*, 226 Ga. App. at 304 (1) (accord).

After carefully considering the evidence outlined above, we find that it shows that the mother has made some progress on her case plan, that she has maintained a

18

strong bond with her child, and that her failure to complete all of the required tasks was not entirely due to circumstances within her control. See *In the Interest of A. F.*, 283 Ga. App. 509, 516 (642 SE2d 148) (2007) (noting that the parents had made significant progress on their case plans and that "their inability to dot every "i" and cross every "t" [of their plans] cannot be placed entirely on their own shoulders."). A parent's failure "to live up to societal norms for productivity, morality, cleanliness and responsibility does not summarily rob [him or her] of the right to raise [his or her] own offspring, nor does it end the [child's] right to be raised by [his or her] own parent[ ]." (Punctuation and footnote omitted.) Id.

Therefore, we conclude that there was insufficient clear and convincing evidence at the time of the termination hearing to support the juvenile court's finding that D. P.'s deprivation is likely to continue. See *In the Interest of C. G.*, 324 Ga. App. 110, 115-117 (749 SE2d 411) (2013); *In the Interest of A. F.*, 283 Ga. App. at 516; *In the Interest of K. J.*, 226 Ga. App. at 305-306 (1); see also *In the Interest of C. J. V.*, 323 Ga. App. at 284-286 (The evidence showed, inter alia, that, despite recent economic downturns in the area, the mother had found a job and worked for three to four months before being laid off, but had been assured by her employer that she would be called back to work. The juvenile court concluded that, because the

mother might be unemployed long enough to lose the apartment she had been renting, her children's deprivation was likely to continue. This Court reversed, finding that this conclusion was based upon mere speculation that was unsupported by clear and convincing evidence.).

3. Finally, the mother contends that there was insufficient clear and convincing evidence to support the court's findings that her son needs "permanency" in his life and that, if her rights are not terminated, the lack of such permanency is likely to cause her son to experience serious physical, mental, emotional, or moral harm. She also argues that the court erred in failing to make any express findings of fact to support its summary conclusion on this issue. We agree with both contentions.

(a) Regarding the lack of findings of fact to support the court's legal conclusion, this Court has previously ruled as follows:

> [A]n order terminating parental rights must contain explicit findings supporting the conclusions that by reason of the deprivation the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. A dry recitation that certain legal requirements have been met is insufficient to satisfy the requirements of the law. The trial judge is to ascertain the facts and to state not only the end result of that inquiry but the process by which it was reached. Although the order in this case recited that continued deprivation would likely cause serious

physical, mental, emotional, or moral harm to the child, it did not set forth any facts which would support this conclusion.

(Citations and punctuation omitted.) *In the Interest of K. J.*, 226 Ga. App. at 307-308 (2) (b).

Accordingly, even pretermitting whether there was sufficient evidence to support the court's order, its failure to state specific findings of fact to support its conclusion that D. P. would suffer serious harm unless the mother's rights were terminated requires that we reverse the termination order. Id.

(b) We also conclude that there was insufficient clear and convincing evidence to support the court's finding that, if the mother's rights are not terminated, the lack of "permanency" in D. P.'s life is likely to cause him serious harm.

First, there was no evidence that the mother's financial problems caused any actual harm to D. P., that she physically, mentally, or emotionally abused D. P. or intentionally neglected him, or that she ever exposed him to such abuse, domestic violence, or other inappropriate behavior. Likewise, there was no evidence that the mother is unfit, abuses drugs or alcohol, or is suffering from a mental illness that would render her incapable of caring for D. P. if she had the financial resources to do

so, nor was there any evidence that D. P. had any special needs that might make such care more difficult.

In fact, both caseworkers who had worked with the mother admitted that the only reasons the Department removed D. P. from the mother's custody in December 2010 were that the mother was unemployed, had no other source of income, and lacked adequate housing for her and D. P. One of the caseworkers even admitted that this case "basically boils down" to the mother's lack of financial resources.

As this Court has previously held, "[t]he mother's inability to care for her child[ ] does not necessarily mean that her current relationship with [the child] is detrimental." (Citations and punctuation omitted.) *In the Interest of A. T.*, 271 Ga. App. 470, 473 (610 SE2d 121) (2005). See also *In the Interest of J. S. B.*, 277 Ga. App. 660, 663 (2) (d) (627 SE2d 402) (2006) (accord).

Second, regarding the court's conclusion that the child would be seriously harmed by the lack of "permanency" if the mother's rights were not terminated, there was

> no expert testimony with regard to the effect on [D.P.] if the mother's parental rights were not terminated; there is no testimony that [D. P.'s] relationship with [his] mother was harmful; and there is no testimony that the [child is] currently suffering due to [his] placement in foster care

22

or that[,] without a permanent placement[, he] would suffer serious harm. We note that the Department presented no identifiable prospects for adoption, and the current foster parents do not want to adopt [D. P.] It appears to us that the Department wishes to terminate [D. P.'s] existing relationship with [his] mother, which they cannot show is likely to cause serious harm, in return for the possibility that [he] will be placed in an as yet unidentified permanent home.

(Citation and punctuation omitted.) *In the Interest of A. T.*, 271 Ga. App. at 474. See also *In the Interest of D. F.*, 251 Ga. App. 859, 862 (555 SE2d 225) (2001) (accord); *In the Interest of J. M.*, 251 Ga. App. 380, 383 (4) (554 SE2d 533) (2001) (accord); *In the Interest of K. J.*, 226 Ga. App. at 308 (2) (b) (accord).

"Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship." (Citation and punctuation omitted.) *In the Interest of A. T.*, 271 Ga. App. at 475. "Where the evidence shows that . . . the mother and [her child] are bonded and emotionally close (as here), the lack of specific evidence regarding potential harm mandates reversal even more strongly." (Citations omitted.) Id. at 474. Moreover, "[a] court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere." (Citation and punctuation omitted.) *In the Interest of C. S.*, 319 Ga. App. at 146 (1).

23

Accordingly, given the absence of sufficient clear and convincing evidence on this issue, the trial court's ruling constitutes reversible error. See *In the Interest of A. T.*, 271 Ga. App. at 475; see also *In the Interest of J. S. B.*, 277 Ga. App. at 663-664 (2) (d) (Although the Department caseworker testified that "the mother's past history of arrests, mental health issues, and inability to maintain employment created an unsafe and unstable environment" for her children, no expert or lay witness testified that the mother's antisocial personality disorder or learning disability would be detrimental to the children, nor did any witness testify that impermanency and instability were causing specific harms to the children. Consequently, this Court concluded that there was insufficient clear and convincing evidence that the children would be seriously harmed unless the mother's parental rights were terminated.).

*Judgment reversed. Phipps, C. J., and Branch, J., concur.*